(163 App. Div. 292)

## PEOPLE v. COLE.    (No. 5994.)

(Supreme Court, Appellate Division, First Department.   July 10, 1914.)

1. PHYSICIANS AND SURGEONS (§ 6*)—"PRACTICE OF MEDICINE"—WHAT CON-
   STITUTES—CHRISTIAN HEALER.

   Under Laws 1907, c. 344, which repealed Public Health Law (Laws
   1893, c. 661, §§ 140–153) and in section 1, par. 7, declares that a person
   practices medicine who holds himself out as being able to diagnose, treat,
   operate, or prescribe for any human disease or physical condition, and
   who shall undertake by any means to treat any human disease, a Chris-
   tian Science healer who holds himself out as able to heal diseases by
   prayers to God and accepts compensation for his services is engaged in
   the "practice of medicine."

   [Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. §§
   6–11; Dec. Dig. § 6.*

   For other definitions, see Words and Phrases, vol. 6, pp. 5488–5491;
   vol. 8, p. 7758.]

2. PHYSICIANS AND SURGEONS (§ 6*) — PRACTICING MEDICINE WITHOUT LI-
   CENSE—WHAT CONSTITUTES.

   Laws 1907, c. 344, which repealed Public Health Law (Laws 1893, c.
   661, §§ 140–153), provides in section 2 (now Consol. Laws, c. 45, § 161)
   that no person shall practice medicine unless duly licensed and author-
   ized, while section 13 (now section 172) provides that the act shall not
   be construed to affect the practice of the religious tenets of any church.
   Held, that a Christian Science healer who held himself out as able to
   cure diseases by prayer to God and maintained a business office away
   from any church, where he received patients and administered for com-
   pensation so-called treatments, which consisted only of silent prayers,
   cannot escape the penalties for practicing medicine without a license on
   the theory that he was merely practicing the religious tenets of his church.

   [Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. §§
   6–11; Dec. Dig. § 6.*]

   Dowling, J., dissenting.

Appeal from Trial Term, New York County.

Willis V. Cole was convicted of practicing medicine without lawful
authorization and registration, and he appeals.   Affirmed.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE,
DOWLING, and HOTCHKISS, JJ.

Noble, Estabrook & McHarg, of New York City (Henry D. Esta-
brook, of New York City, of counsel, and Samuel Untermyer, of New
York City, on the brief), for appellant.

Charles S. Whitman, Dist. Atty., of New York City (Robert C. Tay-
lor, of New York City, of counsel, and Almuth C. Vandiver, of New
York City, on the brief), for the People.

CLARKE, J.   The complaining witness testified that she went to
the office of the defendant on an upper floor of an office building known
as the Brunswick building, 225 Fifth avenue, and that upon the door of
his room was, "Willis Vernon Cole, Christian Scientist."   There were
a number of men and women there, coming and going.   She asked the

_____
*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

defendant if he was Dr. Cole. He stated he was Mr. Cole, a Christian Science healer.

"He said, 'Who recommended you here?' I said I read about him in the newspapers; that I called to see if he could cure my eyes, I had been troubled with eye trouble. And he said, 'How long have you been wearing glasses?' I said, 'Ten years.' He said: 'You understand I do not give any medicine; I only give Christian Science treatment.' I said to him, 'What is Christian Science?' He said, 'I cure by prayer.' He said, 'You must have faith in God, that God don't make us to have any disease, that we must be all love and kindness, and that God would cure the infidel as well as the confirmed believer in his Divine power.' And I said, 'What would be the fee?' And he said $2 for the first treatment and all subsequent treatments $1. The defendant then said, 'I will give you a treatment.' So Mr. Cole had his chair facing mine, and he closed his eyes and raised his hands up to his face and remained in perfect silence for 15 or 20 minutes. He then said: 'That will do for to-day's treatment.' I said to him, 'When will I come back again?' He says, 'You come back on Friday any time.' I paid him $2."

On the next day she went back, and defendant said:

" 'Why, you are looking very well.' I said, 'I feel about the same.' After that he spoke about God is good, and we must have love and faith in God. And then he says he will give me a treatment. So then Mr. Cole placed his chair facing mine again, and closed his eyes and put his hands up to his face, and he remained in perfect silence there for 15 to 20 minutes." Before this treatment she said to Mr. Cole she had a pain in her back; that she had a porous plaster on her back at that time. "I said to him what did he think about the pain I had in my back. He said it was some kind of disease, but he could not tell what it was. He said, 'I can cure it.' He said, 'You must now take off that porous plaster, because Christian Science cannot cure with plasters on.' He said that I must take off my glasses as well as remove the plaster from my back; that I should have more faith and understanding; that I must have more courage; that I should remove the glasses. I said I must keep my glasses as I cannot go without them. I told him I had worn them for 10 years. He said if I wanted to be cured by Christian Science I must remove the glasses. After he gave me the second treatment, I said to this defendant, 'How can you cure locomotor ataxia?' He said, 'Just by prayer and having faith in God.' He said, 'When patients are given up by physicians, they always turn to Christian Science for help.' He said he could cure locomotor ataxia by Christian Science."

She came back again on the 23d of January.

"He said, 'You are looking very well.' I said, 'I removed the plaster that was on my back as you told me to.' And he said, 'I want you also to remove the glasses.' I says, 'I have to keep the glasses on.' I said to Mr. Cole that when I eat bread and potato, I would distress my stomach very much. He said: 'Leave your stomach alone. You go home and eat anything you want to, if you keep bothering your stomach.' He said, 'I can cure that by Christian Science.' I said that I was suffering from delayed menstruation. He said, 'I am glad you spoke about it, as it is all one cause; but I can cure it.' He said, 'I will give you a treatment.' And the treatment was exactly like the treatment before. * * * The last time I brought my little child ten years old who was in the habit of wearing glasses. I said to Mr. Cole that the child has been wearing glasses and she also has a cold. I said, 'Can you cure her by Christian Science?' He said, 'Absolutely.' I said, 'Well, will you cure her?' He said, 'Absolutely.' I said that the child had a pair of roller skates, and, wearing glasses, why, if she should fall she would injure herself. And he said: 'You take the glasses off and let the child run and romp like other children; that mothers should not put such fear in children.' He said: 'I will give the child a treatment and you a treatment.' Before he started the treatment, he said, 'What is the child's

first name?' I said, 'Lucille.' Then he closed his eyes and gave the treatment. "Q. What did he say when he took his hands down and opened his eyes? A. He said that was enough for to-day. I then said to the defendant, 'How is it that you cure cancer?' He said, 'By prayer.' I said I had a friend who was suffering from cancer and had visited Dr. Mason. The defendant said, 'Why, I know Dr. Mason.' He said, 'By all means send your friend to me for treatment.' He said: 'That is the way, when patients are given up by physicians, they always turn to Christian Science for help.''

## On cross-examination:

"Q. You have said, in response to interrogatories on your direct examination, that Mr. Cole said, I will cure this, that, and the other. Did not Mr. Cole tell you on your first visit and reiterate it on subsequent visits that he had no power in and of himself? A. He said he did not have any power.

"Q. That you had every bit of power that he had, did not he? A. Yes.

"Q. That you could heal as well as he if you would study the Bible and rely upon its promises, and offer the prayer of understanding and faith? A. Yes, sir.

"Q. That when Mr. Cole had explained to you that he had no power in himself, that all power came from God, and that you had every particle of power that he had, and that what you needed was faith in the Almighty, you understood by that that if he said 'I can do this' or 'do that,' 'I can cure,' that it was through this means of prayer, did you not? A. Through Almighty God.

"Q. In one of your statements * * * you stated in effect, did you not, that all diseases look alike to a Christian Scientist—that he said that? A. Yes.

"Q. That Mr. Cole told you that? A. That Mr. Cole said that all diseases were alike.

"Q. As a matter of fact, did not Mr. Cole explain to you that it was the teaching of the Bible and of Christian Science that God healed all diseases, and that He was the Great Physician, and that if you would be good and pure and honest and come to Him in sincerity and truth and ask Him for his power, that it would be given to you? A. Well, he said something very similar to it.

"Q. He told you, did he not, that there was nothing mysterious about Christian Science, that you could learn all that he knew? A. Yes, sir.

"Q. He even went so far as to ask you, to suggest, that you buy the book and study it in connection with the Bible? A. Yes, sir.

"Q. And then you would know how to cure yourself and how to remain cured and well? A. Yes, sir. * * *

"Q. Did Mr. Cole look at your tongue? A. No.

"Q. Feel of your pulse? A. No.

"Q. Test your temperature? A. No.

"Q. Make any analysis of your blood? A. No.

"Q. He undertook no diagnosis whatever, did he? A. No.

"Q. Did he put you on a diet? A. No.

"Q. Told you to eat what was set before you? A. He told me to eat anything I wanted to. He said that God never made us to have any disease.

"Q. And that that was a mental—that the body itself had no power to feel, that it was the mind that suffered always, or words to that effect? A. Words to that effect.

"Q. And that God was all mind, and that we were simply an idea of the Almighty—meant us to be well if we would trust Him, or words to that effect? A. Words to that effect.

"Q. And that if we lived honest and pure and kind lives that we would remain well? A. Yes. * * *

"Q. Did he strike you as though he was greedy for money? A. No, he did not act that way to me. * * *

"Q. He never intimated to you on any of those visits that you should pay him. You always asked him what the charge was, did you not? A. Yes. * * *

"Q. Mr. Cole in all of your visits took pains to explain to you, did he not, that so far from being a mystery, so far from having any power himself, that this was a religion that everybody ought to know and practice, did not he? A. Yes."

The defendant testified that he had been for eight years an authorized practitioner of the Christian Science Church, and that he had maintained his office in the Brunswick building for five years in May; that when he received his first knowledge of Christian Science he was a sculptor, and a poet; that he had never studied medicine in any way; that his average income from his practice was about $5,000 or $6,000; that he did not ask people money for treating them. When they tendered it he took it.

"Q. Is it not one of the rules of the Church? A. I don't say there is any definite rule, but it is a practice to treat all who are honest and sincere whether they can pay or not, and that is a rule; we are to help every one."

He testified that he remembered the occasion on which the complaining witness called on him.

"Q. You remember the people who were in the office when she first came, do you? A. I do.
"Q. Were they patients? A. They were.
"Q. All of them? A. Yes, they were there for treatment."

Defendant's account of the first interview with the complaining witness was as follows:

"She sat about four feet away from me, facing me. She told me that she had come to be treated for trouble with her eyes and stomach trouble. I informed her that Christian Science treatment was prayer to God; we did not believe in drugs, medical treatment, anything like that; and she asked me to give her treatment. Something was said in regard to the basis of Christian Science, and I told her substantially that Christian Science was the truth about God, and the truth about man, and the truth about man's relationship to God, and the truth of his birthright as a result of this relationship, which is the foundation of what we teach, and I told her that on this basis disease was no part of her birthright, or inharmony, and when she realized her oneness with God and got in harmony with God that this was the treatment and was what we would do. She sat there about 15 minutes. I covered my face with my hands, or sat with my head partially bowed, for 15 minutes in prayer to God. * * * Mrs. Benzecry asked me how much I charged for treatment, and I told her it was customary to pay $2 for the first treatment and $1 for any other treatments, and she paid me $2. * * *

"At another interview she asked me if she should—spoke to me about taking off her glasses, and I said to her: 'There is no reason that you should not take off your glasses. I took off mine and had been wearing them for years.' And then I started to tell her about the work and practice of Christian Science. * * * I told her I had trouble with my eyes and had several other diseases, and that I had been to a number of physicians, and that I had been healed by Christian Science. * * * I told her that Christian Science was prayer to God. I told her that Christian Science realized that God was omnipotent, or all-powerful, and that He was omniscient, or all knowing; that He was omnipresent, or ever-present; and that because God was omnipotent, omniscient, and omnipresent, and God was good, that it must follow that evil, disease, inharmony, sin, and discord were no part of His being and had no real existence, and I told her that man was the image and likeness of God, and was entitled to dominion, and that his birthright was dominion, and that he had the right to affirm and secure immunity from discord of whatever name and nature, and that disease was like a shadow that flees before the light. * * * I prayed. Our whole interview took about 25 minutes. I remained all this time in silent prayer. That word 'prayer' is a synonym for treatment.

I sat in silence for about 15 minutes, and Mrs. Benzecry sat opposite me, and at the end of that time I took my hands—removed my hands from my eyes and spoke a few words, and she paid me for that treatment, paid me the sum of $1, and that was practically our interview.

"Q. Well, at that interview or at the, first interview did you tell Mrs. Benzecry that you could cure her? A. I told her I could not cure her, that I had no more power to cure her than any one else, that God was the only power and the only healer. I remember one thing I did say to her. That God was no respecter of diseases and could cure one thing just as much as another, and especially when she told me about her delayed menstruation. She asked me about that.  *  *  *  I said to her: 'Mrs. Benzecry, God is no respecter of diseases, and through Christian Science, through prayer, can heal one thing just as readily as another.' And I said substantially the same thing on the third interview when she asked me about the friend who had locomotor ataxia.  *  *  *  I did say Christian Science cured locomotor ataxia through prayer to God. I told her that I had no more power than she did; that God had the only power. She asked me, I believe, if I cured cancer, or if Christian Science cured cancer. I told her that Christian Science cured all manner of diseases through prayer to God, and she told me, I remember at that incident, that she had a friend that had cancer, and this friend had consulted a physician, and I spoke to her in regard to Christian Science treating and healing diseases that the physicians had given up. I told her that there were a number of diseases that the physicians deemed incurable, and that such cases had been successfully treated in Christian Science.

"Q. At the time of these interviews with Mrs. Benzecry you were practicing Christian Science with her, weren't you? A. I was.

"Q. At the time of these interviews were you practicing or trying to practice any other system? A. None other.

"Q. Of healing or religion or anything else? A. Nothing else."

Under cross-examination:

"Q. Now you had an office, and in that office, as I understand, you held yourself out as being able to treat human diseases through the medium or by the means of the Christian Science doctrine of religion? A. Through prayer to God, yes.

"Q. That is the means by which you held yourself out as being able to treat human diseases; is that correct? A. It is incorrect. It is incorrect on this basis that Christian Science does not recognize disease as a reality.  *  *  *  The patients that come to us to be treated for sin and disease and other inharmonious, similar inharmonious conditions, are treated for those through prayer to God, and it is the function of the Christian Science practitioner to offer this prayer to God.

"Q. You don't answer my question at all. Your office was a place in which you held yourself out as being able to treat those people that came to you for sin or disease by the means of the method that you thought was efficacious; was that correct? A. By the means of prayer to God.

"Q. And that is the means that you considered efficacious? A. Yes.

"Q. And you held yourself out as being able to treat them by those means or by that method; is that correct? A. To pray to God for them.

"Q. I am taking now their state of mind, certain people resorted to your office for the purpose of being treated for sin or disease; is that correct? A. It is correct.

"Q. And you used your office as a place where you held yourself out as being able to treat them for what they came to you by methods you thought were efficacious? A. Through prayer to God, yes."

He stated that he would have above 2,500 and 3,000 calls a year at his place. The number of calls were considerably over 3,000 to his best belief.

"Q. And did you treat all patients that came substantially by the same method, and in the same way, all these 3,000 people by the same method of treatment? A. If you mean on that basis I will state I did, through prayer.

"Q. I say did you treat them all by the same method, or did you employ different methods?   A. One method.

"Q. Now it has been testified here both by yourself, and I think by Mrs. Benzecry, you told her that through Christian Science and God all disease was the same; that is correct, is it not?   A. Yes, sir.

"Q. Therefore you would treat by this method anybody who came into your office, no matter with what disease they thought they were afflicted; is that correct?   A. I would not say that.   *   *   *

"Q. What diseases would you except from that treatment?   A. I would not say.

"Q. Well I ask you to say?   A. There is no special disease that I do exempt.

"Q. Then why do you say you would not treat them all?   A. There might be cases that it would appear to be better not to treat.

"Q. Well, I ask you what cases would you refuse to treat?   A. For instance, it might be a case that a person would prefer to have medical treatment.

"Q. I am not asking that; I am asking about people that came to you and wanted to be treated by you.   Now, I ask you would you refuse to treat anybody?   *   *   *   Is there any disease or supposed disease you would not treat if a person came in to you and asked you to treat them?   A. No.

"Q. None whatever?   A. No, sir.   *   *   *

"Q. Does that include contagious diseases, or does it not?   A. It is possible for Christian Science to heal contagious diseases.

"Q. I will ask you to answer my question.   A. I would treat any one that came to me who seemed honest and earnest and who wanted Christian Science treatment.

"Q. Does that include contagious diseases, or so-called contagious diseases; yes or no?   A. I don't think any one would come to me if they had a contagious disease.

"Q. I am not asking you what they would do.   I am asking you what you would do.   Would you be ashamed to treat them?   A. I would not be ashamed to treat them.

"Q. Please tell me whether you would treat them?   A. I have treated them.   *   *   *

"Q. Suppose a person brought a child she said had pneumonia or pleurisy, would you treat it?   A. Of course, I would pray to God for the child.   *   *   *

"Q. Would you tell the parent of the child to take the child to a physician?   A. Why, God is the Great Physician.

"Q. Will you please answer my question.   I did not ask you about God.   A. I would not say to take a child to the physician if they had applied to me to pray to God for the child.

"Q. That is just what I asked you.   Would you or would you not tell them to take a child to the physician?   A. I would not do so.   *   *   *

"Q. Suppose she said she did want Christian Science treatment and then asked whether she should also take it to a doctor, what would you say then?   A. I would say, 'God is mightier than all the doctors.'

"Q. Would you advise her to take her or not to take her?   A. If she asked my advice and was there for treatment, I would say not to take the child.   *   *   *

"Q. Would you therefore tell the mother you advised her not to take the child to a doctor?   A. No, I would not advise her not to take the child to a doctor, I would say, 'That is for you to decide.'

"Q. But you would tell her if she wished to be cured by Christian Science in that case she should not take it?   A. If the mother wishes Christian Science treatment, she should not rely on drugs.

"Q. Or the doctor?   A. Doctors, or other material things."

A number of concessions were made on the trial: That Christian Science is a religion based on the Scriptures, founded by Mary Baker Eddy in 1866.   It is based on the Christian religion.   That Mrs. Eddy's interpretation of the scriptures, which she named Christian Science, is set forth in a book entitled "Science and Health with Key to the Scrip-

tures," first published in 1875, and is the Christian Science text-book. That Mrs. Eddy founded a church to represent the Christian Science denomination at Boston, Mass., in 1879, and that this church, known as the First Church of Christ, Scientist, soon became the parent organization of the Christian Science denomination, with local churches, known as branches to the Mother Church, situated in cities and towns throughout the world. Christian Science congregations and churches began to be formed and organized in the state of New York between the years 1885 and 1890, and in May, 1907, there were in the state of New York 72 Christian Science churches, and there are now 80 or more of these churches in this state. That there were in May, 1907, the date of the passage of this law, about 1,000 Christian Science churches situated in different cities and towns throughout the United States, and that there are now more than 1,200 of these churches, besides 100 or more in foreign countries, and each of them is a distinct congregation having its own separate organization, but known as a branch of the Mother Church in Boston. That in May, 1907, the Christian Scientists in the state of New York and throughout the world were a numerous body of Christians, well known as a distinct denomination, owning many church edifices, and this denomination has steadily and rapidly increased in number of members and number of churches from its beginning until now. That the number of Christian Scientists in the United States is about 1,000,000 people. That the defendant is, and for several years has been, a member of the Mother Church and one of its branch churches, namely, the First Church of Christ, Scientist, in Boston, and the First Church of Christ, Scientist, New York City. That the defendant is, and for several years has been, a practitioner recognized by these churches. That the healing of moral, mental, and physical disorders was practiced by Christian Scientists in the state of New York for at least 20 years prior to the passage of the law upon which the indictment in this case is founded, to wit, May, 1907, and was continuously so practiced, and was being so practiced at the time the law passed, and has been continuously since that time so practiced; and that the work of these practitioners was carried on, and is now carried on, and has ever since been carried on, in substantially the same manner and by substantially the same methods as have been followed by the defendant. That during the year prior to the enactment of this law and at the time of this enactment, there were more than 300 practitioners in active practice in the state of New York, whose cards were published in the "Christian Science Journal" and who made this work their only vocation.

[1] Prior to 1907 the statute (section 153 of the Public Health Law, Laws of 1893, c. 661, as amended by Laws 1895, c. 398) provided as follows:

"Any person who, not being then lawfully authorized to practice medicine within this state and so registered according to law, shall practice medicine within this state without lawful registration * * * shall be guilty of a misdemeanor."

There was no definition in the statute of the phrase, "practice medicine." It had been accepted from the time of Smith v. Lane, 24 Hun,

632, decided in May, 1881, that the practice of medicine meant the use of medicines and drugs for the purpose of curing, mitigating, or alleviating bodily diseases, or manual operations usually performed by surgical instruments or appliances.

In People v. Allcutt, 117 App. Div. 546, 102 N. Y. Supp. 678, affirmed 189 N. Y. 517, 81 N. E. 1171, and again in People v. Mulford, 202 N. Y. 624, 96 N. E. 1125, affirmed on its authority, this court refused to accept Smith v. Lane as authority on the subject, saying:

"We do not consider the remarks of the learned judge, above quoted, as being an exhaustive or exclusive definition of the term 'practice of medicine.' * * * To confine the definition of the words 'practice of medicine' to the mere administration of drugs or the use of surgical instruments would be to eliminate the very corner stone of successful medical practice, namely, the diagnosis."

That case was decided in February, 1907.

In May, chapter 344 of the Laws of 1907 was passed, which repealed article 8 of the Public Health Law and provided a substitute therefor. Section 1, "Definitions," paragraph 7, is as follows:

"The practice of medicine is defined as follows: A person practices medicine within the meaning of this act, except as hereinafter stated, who holds himself out as being able to diagnose, treat, operate, or prescribe for any human disease, pain, injury, deformity or physical condition, and who shall either offer or undertake, by any means or method, to diagnose, treat, operate, or prescribe for any human disease, pain, injury, deformity, or physical condition."

That definition is the same as that found in section 160, art. 8, of the Public Health Law (chapter 45, Consol. Laws; chapter 49, Laws of 1909), with the change of the word "act" to "article."

Section 2 (or, as it now is, section 161) provides: "Qualifications.—No person shall practice medicine, unless registered and legally authorized prior to September first, eighteen hundred and ninety one, or unless licensed by the regents and registered under article eight of chapter six hundred and sixty-one of the laws of eighteen ninety three and acts amendatory thereto, or unless licensed by the regents and registered as required by this article; nor shall any person practice under this article who has ever been convicted of a felony by any court, or whose authority to practice is suspended or revoked by the regents on recommendation of the State Board. * * *"

Section 166 provides for the "Admission to examination."

Section 167: "Questions.—The board (meaning the board of examiners) shall submit to the regents as required, lists of suitable questions for thorough examinations in anatomy, physiology, hygiene, sanitation, chemistry, surgery, obstetrics, gynecology, pathology, including bacteriology, and diagnosis."

Section 169: "Licenses."

Section 170: "Registry; revocation of license; annulment of registry."

Section 172: "Certificate presumptive evidence; unauthorized registration and license prohibited."

Section 173: "Construction of this article.—This article shall not be construed to affect commissioned medical officers serving in the United States army, navy or marine hospital service, while so commissioned; or any one while actually serving without salary or professional fees on the resident medical staff of any legally incorporated hospital; or any legally registered dentist exclusively engaged in practicing dentistry; or any person or manufacturer who mechanically fits or sells lenses, artificial eyes, limbs or other apparatus or appliances, or is engaged in the mechanical examination of eyes, for the purpose of constructing or adjusting spectacles, eye glasses and lenses; or any lawfully qualified physician in other states or countries meeting legally

registered physicians in this state in consultation; or any physician residing on a border of a neighboring state and duly licensed under the laws thereof to practice medicine therein, whose practice extends into this state, and who does not open an office or appoint a place to meet patients or receive calls within this state; or any physician duly registered in one county called to attend isolated cases in another county, but not residing or habitually practicing therein; or the furnishing of medical assistance in case of emergency; or the domestic administration of family remedies; or the practice of chiropody; or the practice of the religious tenets of any church.  *  *  *"

Section 174: "Penalties and their collection.—Any person who, not being then lawfully authorized to practice medicine within this state and so registered according to law, shall practice medicine within this state without lawful registration or in violation of any provision of this article;  *  *  * shall be guilty of a misdemeanor."

Therefore this act for the first time clearly defines by statute the phrase "the practice of medicine." The definition is broad enough to cover the acts of the defendant because he "holds himself out as being able to  *  *  *  treat  *  *  *  any human disease," and he did "undertake to treat." The language of the statute is "by any means or method." This covers the means or method used by him. While he denied the material existence of disease and said it was merely mental, yet he undertook to treat people he called patients for what they told him was the matter with them; in other words, what they thought were diseases. He had an office for that purpose; he received fees therefor; he habitually terms what he did his "treatment." He conducted a pecuniarily successful business. He called himself a practitioner, but admitted that the popular phrase was healer. Whatever the believers in Christian Science may think about disease, the law regards it as a fact. It requires the vaccination of children; it requires the examination and quarantine of children admitted to institutions, and a certificate, where the child has diptheria, scarlet fever, measles, whooping cough, or any other contagious or infectious disease, or any hereditary or other constitutional disease. In section 320 it provides:

"Tuberculosis is hereby declared to be an infectious and communicable disease, dangerous to the public health.  *  *  *"

[2] The one question presented here is whether the defendant is permitted to do what he has done under the clause of the statute:

"This article shall not be construed to affect  *  *  *  the practice of the religious tenets of any church."

Is the commercialized use of prayer for the avowed purpose of treating all persons seeking cure for all kinds of bodily ills the practice of the religious tenets of a church?

In People v. Mulford, 140 App. Div. 716, 125 N. Y. Supp. 680, affirmed 202 N. Y. 624, 96 N. E. 1125, affirming the conviction of the defendant of the crime of practicing medicine without being registered, it appeared from the evidence that the defendant had an office where he received patients and treated them for physical ailments and received compensation therefor; that he gave no medicine and prescribed none; that he performed no surgical operations and used no surgical instruments; that his entire treatment consisted of the laying on of hands and manipulation, breathing and rubbing his hands together;

and that his treatment was beneficial to his patients. The sign in front of his office indicated that his treatment was known and designated as suggestive therapeutics.

In State v. Peters, 87 Kan. 265, 123 Pac. 751, decided in May, 1912, the defendant was also a practitioner of suggestive therapeutics. The appellant explained his practice thus:

"First had my attention called to healing people about 25 years ago from the study of the Bible. I supplemented that study by different branches. I have religious beliefs as to healing. I believe that the words of Jesus Christ in regard to healing can be carried out now just the same as they ever could. I believe from my study of the Bible and my supplemental study that I can carry out to some extent the healing as by Him practiced. My conviction is that I can do the work and ought to do it, and this has been my belief during the past three years, and it is my conviction that it is a duty I owe and must perform it. My supplemental studies have been psychology and suggestive therapeutics. I have studied the Weltmer system of suggestive therapeutics."

The president of the Weltmer Institute testified:

"The fundamental principle in suggestive therapeutics is that the movement of the mind is the remedy in healing. Mind is both finite and infinite intelligence which governs all physical and mental actions, conscious and unconscious. Thinking is the mind's mode of acting. Then thought is the movement of the mind. Whatever other method is used is for the purpose of starting the mind of the patient into a state of activity in which the vibrations of his own mind will change the cell vibrations of his body. A movement of the mind that would have in it the constructive idea of replacing diseased tissue with healthy tissue would be a therapeutic thought. Anything that will induce this subjective intelligence to begin the process of healing is a therapeutic suggestion. Anything from the outside world that would secure a response from the suggestive mind would be a suggestion."

The Kansas statute provided that any person shall be regarded as practicing medicine who represented:

"That he is authorized to or does treat the sick or others afflicted with bodily infirmities, but nothing in this act shall be construed as interference with any religious beliefs in the treatment of diseases." Laws 1908, c. 63, § 1.

In affirming the conviction the court said:

"The appellant was regularly engaged in soliciting, receiving, and treating patients for bodily infirmities, for fees charged and collected. This is within the statute. * * * The claim of the appellant that he only practices a religious belief, within the exception which declares that nothing in the act shall be construed to interfere with any religious beliefs in the treatment of diseases, cannot be sustained. The only basis for this claim is the appellant's testimony that he believed the words of Jesus in regard to healing; that from Bible study and supplemental study of psychology and suggestive therapeutics he believes that he can carry out this healing practice to some extent, and that it is his duty to do so. Still the fact remains uncontradicted that he diagnosed diseases and treated patients in a matter of fact way by manipulations and rubbing. He was thus treating people as a business for compensation, by outward physical means, and was not engaged merely in a religious observance, or, as counsel say, 'practicing a religious belief.' The place and value of suggestion in the treatment of diseases need not be discussed, for, apart from this, the appellant engaged in the practice requiring an examination and certificate under the statute. * * * The medical practitioner may entertain any belief his conscience approves, but this will not excuse him from a failure to observe the laws of the state regulating the calling in which he is engaged."

In Smith v. People, 51 Colo. 270, 117 Pac. 612, 36 L. R. A. (N. S.) 158, decided April, 1911, defendant was convicted for "practicing medicine without a license."

The statute defined the "practice of medicine" to be holding one's self out to the public as being engaged in the diagnosis and treatment of diseases or injuries of human beings; or the suggestion, recommendation, or prescribing any form of treatment for the intended palliation, relief, or cure of any physical or mental ailment of any person, with the intention of receiving therefor, directly or indirectly, any fee, gift, or compensation whatsoever; or the maintenance of any office for the reception, examination, and treatment of any persons suffering from disease or injury of body or mind, or attaching any word or abbreviation to one's name indicative that he is engaged in the treatment or diagnosis of injuries of human beings. It further provided:

"But nothing in the act shall be construed to prohibit the practice of the religious tenets or the general belief of any church whatsoever, not prescribing medicine."

The court said:

"The people's evidence shows that defendant kept a place of business for healing the sick; * * * that there were signs in the windows reading: 'Professor Smith, Healer.' 'Office hours 9 to 12, 2 to 6.' A sign on the door reading: 'Professor Smith, Healer.' 'Walk in.' * * * He claimed his treatment was a natural one—a gift from the Almighty; claimed to restore people to health; said he could cure any disease a medical man could, and many they could not; could cure diarrhea, and stomach, spinal, nervous and throat troubles, and pneumonia; mentioned several cases of pneumonia he had recently cured that doctors had given up; said he diagnosed his cases and treated them without medicine.

"Defendant testified that he belonged to the church of 'The Divine Scientific Healing Mission,' a corporation; that he was a preacher of the gospel, and a healer of the sick; held services Sunday afternoons at Howe Hall, where he preached and cured the sick; said his church had branches everywhere; he occupied a couple of living rooms, not an office, where he lived and treated the sick and afflicted without the use of drugs or a knife; some he charged, some he did not; never turned any one away; the signs had been there for over two years and spoke for themselves; did not practice medicine or diagnose diseases; people came to his rooms, told him what was the matter with them, and he treated them; could not tell whether patients had gout, smallpox or rheumatism, but could and did treat and cure them; 'healer' means curing the sick. The certificate of incorporation of 'The Divine Scientific Healing Mission,' showing its objects to be, 'Preaching, teaching and practicing the gift of healing, guided and directed by divine power, by laying on of hands, regardless of faith, creed, sect or race, to promote peace on earth, good will to men;' also, containing the tenets of 'The Divine Scientific Healing Mission,' as follows: 'We believe in healing the suffering humanity by laying on of hands to be the gift of the divine spirit, and by sound reason we can comprehend its virtue'—was offered in evidence and excluded by the court.

"It is the nature of defendant's business, not the objects of the corporation or the tenets of his church, that is in controversy. The evidence shows he was practicing medicine within the definition of the statute, and was using the title 'healer,' to his name, to indicate that he was engaged in the business of healing the sick. He treated in his office or place of business, for hire, persons suffering from disease, for the purpose of curing them. He held himself out to the public as a professional healer of diseases, and a practitioner of the healing art. The statute lays hands on commercial healing as a money-making occupation, business, or profession, regardless of the method of treat-

ment or curative agency employed. It concerns the public health, and should be liberally construed to accomplish the object of its enactment.  \*   \*   \*

"Defendant claims he comes within the exemption which says: 'Nothing in this act shall be construed to prohibit  \*   \*   \* the practice of the religious tenets or general beliefs of any church whatsoever, not prescribing or administering drugs.' The Constitution provides there shall be no interference with the 'free exercise and enjoyment of religious profession and worship.' The statute does not interfere with the free exercise of religion or worship; Any persons, individually or collectively, any minister, or any church congregation may resort to prayer whenever they wish for the healing of the sick. No attempt is made to interfere with religion or religious devotions. This does not, however, authorize one under the cover of religion or religious exercise to go into healing commercially for hire, using prayer as the curative agency or treatment. Religion cannot be used as a shield to cover a business undertaking. Defendant was engaged in a business venture, not a religious exercise. The practice of medicine, defined by our statute, means the practice of the healing art commercially, regardless of the curative agency employed. The commercial practice of healing by prayer, followed as a money making venture or occupation, is the practice of medicine within the plain meaning of the statute.  \*   \*   \* "

In People v. Spinella, 150 App. Div. 923, 135 N. Y. Supp. 1133, affirmed 206 N. Y. 709, 99 N. E. 1114, the record in this court shows that the defendant was the head of a church of his own with an altar, candles, crucifix, vestments; that he conducted services, kneeling before the altar, praying and saying the rosary and making the sign of the cross; that he said that he receives his power from the Heavens and he invokes the Saints, the Holy Madonna, the Angels and God. His treatment was given in front of the altar. He claimed to have a divine revelation and to have accepted the power to perform miracles over sickness, and held himself out as curing all sorts of diseases through miraculous power. Witnesses testified that they attended his church, and had been benefited and cured by him. Upon the appeal counsel squarely raised the point that defendant's acts had been done in the practice of the religious tenets of a church and invoked the exception contained in section 173 of the Public Health Law; but his conviction was unanimously affirmed by this court and by the Court of Appeals.

State v. Buswell, 40 Neb. 158, 58 N. W. 728, 24 L. R. A. 68, was the case of a Christian Scientist. The opinion states fully the defendant's testimony as to his belief. The court said:

The defendant claimed that "to hold that the practices of the defendant are a violation of the law, would be to abrogate section 4, art. 1, of the Constitution of this state, which provides that all persons have the natural and indefeasible right to worship Almighty God according to the dictates of their own conscience, and also the second provision of section 4 of the enabling act, which provides that perfect toleration of religious sentiment shall be secured, and no inhabitant of said state shall ever be molested in person or property on account of his or her mode of religious worship. The defendant, and those of the same faith with him, believe as a matter of conscience that the giving of medicine is a sin; that it is placing faith in the power of material things which belongs alone to Omnipotence. To the Christian Scientist it is as much a violation of the law of God to take drugs for the alleviation of suffering or the cure of disease as for a Methodist clergyman to take the name of his God in vain to relieve his over-wrought feelings. It is as much the duty of the defendant, as his conscience and understanding teach him his duty, to visit the sick and afflicted and relieve their distress of mind, as it is for

the Presbyterian minister to go into his pulpit on Sabbath morning and preach the word of God according to the understanding of that denomination, or visit the bedside of one of his sick parishioners and administer that religious consolation which is so dear to the heart of the Christian and which is apparently so necessary to their spiritual welfare. The act of the latter the eyes of all Christendom look upon in admiration as the performance of a Christian duty. Upon the former the able counsel for the state would have the world look as upon the act of a criminal."

## After citing certain extracts from the Bible, the court proceeded:

"In the light of these instances, cited from defendant's own authority, it is confidently believed that the exercise of the art of healing for compensation, whether exacted as a fee or expected as a gratuity, cannot be classed as an act of worship. Neither is it the performance of a religious duty, as was claimed in the district court. * * * Under the indictment, the sole question presented upon the evidence was whether or not the defendant within the time charged had operated on, or professed to heal, or prescribed for or otherwise treated, any physical or mental ailment of another. There was involved no question of sentiment nor of religious practice or duty. If the defendant was guilty as charged, neither pretense of worship nor of the performance of any other duty should have exonerated him from the punishment which an infraction of the statute involved."

State v. Marble, 72 Ohio St. 21, 73 N. E. 1063, 70 L. R. A. 835, 106 Am. St. Rep. 570, 2 Ann. Cas. 898, was also the case of a Christian Scientist. The court said:

"The conceded facts are that the defendant did not recommend or prescribe for the cure or relief of Christ Hehl any drug, medicine, appliance, application, or operation; but, on the contrary, that he made no diagnosis or any physical examination, gave him no directions as to food, diet, exercise, or any other directions, nor did he make any inquiry as to the nature of the disease with which he was afflicted. The only thing he did was to offer prayer for his recovery. He was called to see Hehl for rheumatism, but called on him but once, and after that gave him what is among the followers of Christian Science known as absent treatment for one week, and at the end of that time Hehl paid him $5 for his services. The defendant did not have a certificate from the State Board of Medical Registration and Examination as required by the statute.

"It is contended that the word 'treatment' is to be given its meaning as used in the practice of medicine, and that as so read it means the application of remedies to the curing of disease; that a remedy is a medicine or application or process; that process is an action or operation; and that prayer for the recovery of the sick is neither. * * * If its followers call it treatment, they ought not to be heard to say it is not. Dr. O. W. Holmes, Med. Ess., says, 'Disease is to be treated by anything that is proved to cure it.' * * *

"The next contention is that the statute interferes with defendant's right to worship God according to the dictates of his conscience. * * * But it is said the offering of prayer to God for the recovery of the sick is not against public health or public morals or public safety or public welfare. Admitted. But is that a correct statement of the case? If the defendant prayed for the recovery of Hehl, that was the treatment he gave him for the cure of his rheumatism and for which Hehl paid him. He was practicing healing or curing disease. To assume that legislation may be directed only against the administering of drugs or the use of the knife is to take a too narrow view. The subject of the legislation is not medicine and surgery. It is the public health or the practice of healing. The state might make it an offense, as has been done in New York (People v. Pierson, 176 N. Y. 201 [68 N. E. 243, 63 L. R. A. 187, 98 Am. St. Rep. 666]), for any one to omit to furnish medical attendance to those dependent upon him, and at the same time leave him at

liberty to die in any manner he may choose. But this is not all. While the state may not deem it wise to go to the extent of requiring the individual to avail himself of the services of a physician, yet it may not wish to hasten his death and so to transfer to itself the burden of supporting those dependent upon him by making it possible for him to employ an empiric. Again, where there is an infectious or contagious disease, the public welfare may be vitally affected by a failure promptly to recognize it, and so the state is interested in permitting to practice the art of healing only those possessing recognized qualifications. So that, regarding disease rather than the treatment of it as the subject of the legislation, it is not necessary that the statute be preventive of particular practices, but it may make the right to undertake the treatment of disease dependent upon the possession of reasonable qualifications."

The appellant relies upon State v. Mylod, 20 R. I. 632, 4 Atl. 753, 41 L. R. A. 428, a case of a Christian Scientist. The court there pointed out that the defendant not only did not attempt to treat disease, but he denied its very existence. We considered this case in People v. Allcutt, supra, saying:

"In contrast with this last case is People v. Pierson, 176 N. Y. 201, 68 N. E. 243, 63 L. R. A. 187, 98 Am. St. Rep. 666. Pierson believed in 'divine healing.' His child had catarrhal pneumonia and died. Pierson did not call in a physician, but believed the child could be cured by prayer. He was convicted under section 288 of the Penal Code for willfully omitting to furnish medical attendance to a child."

In the Pierson Case Judge Haight wrote as follows:

"The remaining question which we deem it necessary to consider is the claim that the provisions of the Code are violative of the provisions of the Constitution, article 1, § 3, which provides that: 'The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind; and no person shall be rendered incompetent to be a witness on account of his opinions on matter of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state.' The peace and safety of the state involves the protection of the lives and health of its children as well as the obedience to its laws. Full and free enjoyment of religious profession and worship is guaranteed, but acts which are not worship are not. A person cannot, under the guise of religious belief, practice polygamy and still be protected from our statutes constituting the crime of bigamy. He cannot, under the belief or profession of belief that he should be relieved from the care of children, be excused from punishment for slaying those who have been born to him. Children when born into the world are utterly helpless, having neither the power to care for, protect, or maintain themselves. They are exposed to all the ills to which flesh is heir, and require careful nursing and at times, when danger is present, the help of an experienced physician. But the law of nature, as well as the common law, devolves upon the parents the duty of caring for their young in sickness and in health, and of doing whatever may be necessary for their care, maintenance, and preservation, including medical attention if necessary, and an omission to do this is a public wrong which the state, under its police powers, may prevent. * * *

"We are aware that there are people who believe that the divine power may be invoked to heal the sick, and that faith is all that is required. There are others who believe that the Creator has supplied the earth, nature's storehouse, with everything that man may want for his support and maintenance, including the restoration and preservation of his health, and that he is left to work out his own salvation, under fixed natural laws. There are still others who believe that Christianity and science go hand in hand, both proceeding from the Creator; that science is but the agent of the Almighty through which he accomplishes results; and that both science and divine power may

be invoked together to restore diseased and suffering humanity. But, sitting as a court of law for the purpose of construing and determining the meaning of statutes, we have nothing to do with these variances in religious beliefs and have no power to determine which is correct. We place no limitations upon the power of the mind over the body, the power of faith to dispel disease, or the power of the Supreme Being to heal the sick. We merely declare the law as given us by the Legislature. We have considered the legal proposition raised by the record, and have found no error on the part of the trial court that called for a reversal."

In the case at bar this court has no right, and does not presume, to pass upon the faith, belief, or religious tenets of the Christian Scientists or the efficacy of the methods of their practitioners in treating disease or error. Its sole concern is whether upon the facts proven the defendant was properly convicted of practicing medicine without being licensed and registered, and whether the conceded acts come within the exception as the practice of the religious tenets of any church.

"Tenet" is defined by the Century Dictionary as "any opinion, principle, dogma, or doctrine which a person, school or sect holds or maintains is true." A man's right to hold and express such is unquestioned. But when he advances from the realm of thought to that of action, he must obey the law.

In Watson v. Maryland, 218 U. S. 174, 30 Sup. Ct. 644, 54 L. Ed. 987, Day, J., said:

"It is too well settled to require discussion at this day that the police power of the states extends to the regulations of certain trades and callings, particularly those which closely concern the public health. There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine. Dealing, as its followers do, with the lives and health of the people and requiring for its successful practice general education and technical skill, as well as good character, it is obviously one of those vocations where the power of the state may be exerted to see that only properly qualified persons shall undertake its responsible and difficult duties. To this end many of the states of the Union have enacted statutes which require the practitioner of medicine to submit to an examination by a competent board of physicians and surgeons, and to receive duly authenticated certificates showing that they are deemed to possess the necessary qualifications of learning, skill, and character essential to their calling. In Dent v. West Virginia, 129 U. S. 118, 9 Sup. Ct. 231, 32 L. Ed. 623, the subject is elaborately considered, and this view affirmed by Mr. Justice Field, speaking for the court."

Upon the foregoing authorities we reach the conclusion that the acts complained of constitute the practice of medicine, were not the practice of the religious tenets of any church, and to authorize the defendant to administer the treatment, which he concedes he did, he must have first been duly licensed and registered in accordance with the provisions of the Public Health Law.

It follows that the judgment of conviction appealed from should be affirmed.

INGRAHAM, P. J., and LAUGHLIN and HOTCHKISS, JJ., concur. DOWLING, J., dissents.

LAUGHLIN, J. I concur with Mr. Justice CLARKE, but I am of opinion that the acts performed by the defendant if performed in a Christian Science Church or in visiting the members of the church

or others, and so administering to them without charge, would not violate the statute.

DOWLING, J. (dissenting).   I fully agree with the conclusion reached by Mr. Justice CLARKE that the defendant is not protected by the clause of the statute providing that:

"This article shall not be construed to affect * * * the practice of the religious tenets of any church."

The record as quoted from in that opinion clearly shows the commercial phase of the defendant's activities as distinguished from any religious observance.   None of the indicia of worship were present in the defendant's actions, which were not had in a place of religious worship nor in any building connected therewith.   They were not performed in accordance with the discipline enjoined by his church.   They were not accompanied by any act of worship, prayer, or devotion in which the person seeking relief participated.   Had the tenets of the Christian Science Church recognized the interposition of the agent or official known as a "healer" who, in its church building devoted to worship, or in a building connected therewith, joined in prayer with believers in those same tenets to procure from the Almighty relief for their afflictions, I believe such acts would have come within the saving clause of the statute, whether or not a fee or gratuity was paid for the aid thus afforded by the "healer."   But where a person opens a business office disconnected from any place of worship, and in surroundings incongruous with any idea of sacrifice or prayer, and for pecuniary consideration furnishes such services as he undertakes to give, then it is no longer a question of one's following the tenets of his religion, but of one's engaging in a purely commercial pursuit, which has brought in to this defendant an income of from $5,000 to $6,000 a year.

Still, as I view this case, and with due respect for the authorities which have been so persuasively presented in the majority opinion, I do not believe the pursuit in which the defendant was engaged was the practice of medicine.   So far from that being the case, the record shows that the defendant disavowed any personal ability or power to influence or affect the condition of the person seeking relief, and urged in every possible way the view that God alone, whom he called the "Great Physician," could cure what was called "disease," and that those who lived honest, pure, and kindly lives would remain well.   He emphasized the fact that God was the only healer, and that prayer to God was the only efficacious means for relief.   He practiced no deceit, and made no false professions of ability to be of service.   He disavowed any mysterious element in his own practices, and told the witness that by reading Mrs. Eddy's works she could master the means for obtaining relief as well as he had done.   Starting with the negation of the existence of disease as a physical fact and following it up with the statement that what is ordinarily recognized as the presence of disease is simply evidence of "a lack of harmonious relation with the Almighty," he suggested as the only recourse the restoration of a proper spirit of harmony with, and obedience to, the Maker, which condition could be brought about by the person who came to him for help without his

assistance, but to bring about which condition he was willing to assist if she so desired. He made no diagnosis; he made no effort to determine the existence or nonexistence of any specific disease; he performed no manipulations, passes, or any physical acts tending to create a belief that he was exercising visibly any power to relieve the witness; he made no claim of any power resident in himself to relieve any condition which might exist in her.

Herein, it seems to me, is where what he did fails to bring him within the scope of the statute. That statute as quoted defines one as practicing medicine who holds himself out as being able "to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity, or physical condition, and who shall either offer or undertake, by any means or method, to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition." These four words, "diagnose, treat, perform or prescribe," seem to me to refer to acts performed by a practitioner which imply not only affirmative action upon his part, but the assumption and claim of ability to produce results by his own intervention and skill. The Century Dictionary defines "treat" as: "(9) To manage in the application of remedies, as, to treat a fever or patient." This implies action by the person assuming to treat. When one goes to a physician for diagnosis, treatment, operation, or prescription of a remedy, one does so in reliance upon the skill, knowledge, or experience of the physician, and in the belief that he will apply to the best of his ability the sum of his experience and knowledge in the alleviation of the patient's physical illness. There can be no such reliance called for or expected in one who makes no profession of knowing anything of disease, who, in fact, denies its existence, and who simply undertakes to intercede with the Almighty for the extension of His mercy in restoring the spiritual balance of one who deems himself ill. There is no law in this state which compels an adult person, suffering from disease, to obtain medical assistance. There are those who, when afflicted by disease, believe that only through human aid can they be restored to health, and who therefore seek the advice of a physician; there are those who, still believing in the existence of disease, believe that aid comes not alone through human agency, but that God himself, in response to the prayer of the devout, can set aside natural laws, and, through His omnipotence, grant relief from suffering and disease; there are, again, those who refuse to accept the general consensus of opinion of mankind that disease exists, and who choose to regard what is commonly called "disease" as evidence only of a condition of spiritual unrest or disorder, for which relief can be obtained only from the Almighty by prayer. It is to assist this last class that the defendant's services were offered, and, whether he performed those services for those who believed in the tenets of his own faith or not, it seems to me clear that in offering his prayers he was not practicing medicine. Nothing could be further from any conventional notions of extending medical assistance than what was done by the defendant. There is no reason to doubt his statement that he actually spent in prayer the time described by the witness. Assuming, as he had the right to do, that the witness was act-

ing in good faith in going to him, there is no reason to doubt that he believed honestly that by his prayers he could assist her in placing herself in the proper spiritual attitude toward her Maker.

Under all these conditions, I believe that the record does not disclose facts sufficient to justify a finding that the defendant was practicing medicine within the terms of the statute, and that the conviction was therefore improperly had and should be reversed.