# COURT OF APPEALS,
## October 3, 1916.

## THE PEOPLE OF THE STATE OF NEW YORK RE-SPONDENT v. WILLIS V. COLE, APPELLANT.

### (219 N. Y. 98.)

PUBLIC HEALTH LAW—CHRISTIAN SCIENCE PRACTITIONERS—WHEN STATUTE DOES NOT PROHIBIT OFFER OF PRAYER FOR HEALING OF DISEASE IN ACCORDANCE WITH THE TENETS OF THE CHRISTIAN SCIENCE CHURCH.

The Public Health Law, forbidding the practice of medicine by a person not licensed and registered as a physician contains the qualification that the statute shall not be construed to affect the practice of the religious tenets of any church (161–173) one of the tenets of the Christian Science Church is the healing of physical disease by prayer; that prayer to God will result in complete cure of particular diseases in a prescribed individual case. The defendant was not a licensed physician, but he was a member of the Christian Science church and one of its recognized practitioners, who in the present case, assumed by silent prayer and for a money consideration to practice the healing of a patient of trouble with the eyes and a pain in the back. He testified that he was practicing Christian Science as laid down by the church and denied practicing medicine. He made no diagnosis and prescribed no other remedy. On an indictment for violating the Public Health Law, *Held*, that although defendant did " treat '" the investigator by " any (some) means or method," as the word is used in the General prohibition contained in the statute (160 subd. 7) the statute is broad enough to permit offering prayer for the healing of disease in accordance with the recognized tenets of the Christian Science Church. The religious tenets of a church must however, be practiced in good faith to come within the exception. When such practice is a fraud or pretense it is not excepted, from the general prohibition, and when a person claims to be practicing the religious tenets of any church particularly where compensation is taken therefor and the practice is apart from a church edifice or the sanctity of the home of the applicant, the question whether such per-

son is within the exception should be left to a jury as a question of fact. Hence the Court erroneously charged the jury: " If you find from the evidence in this case that this defendant did engage in the practice of medicine as alleged in the indictment, within the definition which I have given to you, it is no defense that he did what he did from any sense of duty, or that he did these acts in the practice of the religious tenets of the Christian Science church."

People v. Cole, 163 App. Div. 392, reversed.

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered July 10, 1914, which affirmed a judgment rendered at a Trial Term for the county of New York upon a verdict convicting the defendant of the crime of practicing medicine without lawful authorization and registration.

The facts, so far as material, are stated in the opinion.

*Samuel J. Elder, Herbert Noble, Henry D. Estabrook, Edmund A. Whitman* and *Clifford P. Smith* for appellant.

*Edward Swann, District Attorney (Robert C. Taylor* of counsel), for respondent.

CHASE, J.:

On February 18, 1911, on an application therefor by the New York County Medical Society, a warrant was obtained against the defendant charging him with practicing medicine as defined by section 160 of the Public Health Law of the state of New York, without being duly licensed therefor. (People v. Cole, 25 N. Y. Crim. Rep. 350.)   On March 21, 1911, he was indicted by a grand jury of the county of New York.   The indictment charges him with the crime of practicing medicine without lawful authorization and registration and alleges that such unlawful practicing of medicine occurred on the 19th day of January, 1911, and continually thereafter to and in-

cluding the 28th day of January, 1911. The defendant was tried on such indictment in the New York Supreme Court Criminal Term, but the jury failed to agree and was discharged. Another trial was had in the same court and resulted in a verdict of guilty and a judgment was accordingly entered against the defendant on the 30th day of March, 1912. He appealed from such judgment to the Appellate Division where it was affirmed by a divided court. (People v. Cole, 163 App. Div. 292.) An appeal was then taken from such judgment of affirmance to this court.

Practicing medicine when unaccompanied by acts that are in themselves evil, vicious and criminal, is not a crime at common law. Practicing medicine is not *malum in se*. It is important in the interest of public health and public welfare that a person holding himself out as a physician or healer of diseases, should have the education, training, skill and knowledge adequate for such purposes. Statutes designed to protect public health and general welfare by regulating the practice of medicine, in some part or all of the territory constituting this state, have been enacted from time to time since 1760.

When a person is charged with practicing medicine without a license it is necessary to examine the acts of the legislature to ascertain whether the practices complained of are in violation of the statute law.

The Public Health Law (Cons. Laws, ch. 45) of this state provides, and did provide at all the times mentioned in the indictment, that " No person shall practice medicine, unless registered and legally authorized prior to September first, eighteen hundred and ninety-one, or unless licensed by the regents and registered under article eight of chapter six hundred and sixty-one of the laws of eighteen hundred and ninety-three and acts amendatory thereto, or unless licensed by the regents and registered as required by this article.  *  *  * ''  (Public Health Law, § 161.)  " The practice of medicine is defined as

follows: " A person practices medicine within the meaning of this article, except as hereinafter stated, who holds himself out as being able to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition, and who shall either offer or undertake, by any means or method, to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition." (Public Health Law, § 160, subd. 7.)

The statute also provides: " This article shall not be construed to affect * * * the practice of the religious tenets of any church * * *.'" (Public Health Law, § 173.)

Our Constitution provides: " The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind; * * * but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state." (Constitution of the State of New York, article 1, section 3.)

The defendant was never registered or licensed as a practitioner of medicine. He is a member of the Christian Science church and a recognized practitioner within the rules of that church. For about seven years he maintained an office in the city of New York. At the times mentioned in the indictment, his office was on the ninth floor of a building at Fifth avenue and Madison square. It consisted of two rooms; one, a reception room containing chairs, tables, a clock and literature; and an inner office containing a desk, two chairs, and a telephone. On the door of his office were the words: " Willis Vernon Cole, Christian Scientist."

The evidence taken on the trial consisted of the testimony of a woman who for seven years had been employed by and under the direction of the New York County Medical Society as an investigator, and the testimony of the defendant.

The investigator testified that at her first interview with the defendant on January 19, 1911, she waited in the reception room of his office with others until an opportunity arrived to see him and she then went into the inner office. She further testified as follows:

"I asked him if he was Dr. Cole. And he said he was Mr. Cole, a Christian Science healer. * * * I said * * * that I read about him in the newspapers; that I called to see if he could cure my eyes, I had been troubled with eye trouble. And he said, 'How long have you been wearing glasses,' And I said, 'Ten years.' He said, 'You understand I do not give any medicine, I only give Christian Science treatment.' * * * I said to him, 'What is Christian Science,' And he said, 'I cure by prayer.' He said that 'You must have faith in God; that God don't make us to have any disease; that we must be all love and all kindness and that God would cure the infidel as well as the confirmed believer in his Divine Power.' And I said what would be the fee? And he said $2 for the first treatment and all subsequent treatments $1. * * * The defendant then said, 'I will give you a treatment.' So Mr. Cole had his chair facing mine, and he closed his eyes and raised his hands up to his face and remained in perfect silence for fifteen or twenty minutes. * * * He said, 'That will do for to-day's treatment. * * * You come back on Friday any time.'" On Friday, the next day, she returned to his office. Her testimony as to what occurred is as follows:

"I went in and he said to me, 'Why, you are looking very well.' And I said, 'I feel about the same.' And after that, why, he spoke about God is good and we must have love and faith in God. And then he says, why, he will give me a treatment. So that Mr. Cole placed his chair facing mine again, closed his eyes and put his hands up to his face and we remained in perfect silence there for about fifteen or twenty minutes."

She further testified that before the treatment she said to

him, " ' Mr. Cole, I have a pain in my back.' * * * I then said that I had a porous plaster on my back at that time; and I said to him what did he think about the pain I had in my back. He said it was some kind of disease, but he could not tell what kind it was; he said, ' I can cure it.' * * * He said, ' You must now take off that porous plaster because Christian Science cannot cure with plasters on.' * * * He said that I must take off my glasses as well as remove the plaster from my back * * * That I should have more faith and understanding; that I must have courage; that I should remove the glasses. * * * I said I must keep my glasses as I cannot go without them. * * * He said if I wanted to be cured by Christian Science I must remove the glasses. * * * I said, ' How can you cure locomotor ataxia. ' He said, ' Just by prayer and having faith in God.' He said, ' When patients are given up by physicians they always turn to Christian Science for help.' " He told her to come back on Monday, January 23. She did so. She said to him, " ' I removed the plaster that was on my back as you told me to.' And he said, ' I want you also to remove the glasses.' I says, ' I have to keep the glasses on.' * * * I said, ' * * * when I eat bread and potato I would distress my stomach very much.' He said, ' Leave your stomach alone; you go home and eat anything you want to.' * * * * "

She returned again on January 27 and brought her little girl with her. The little girl wore glasses. She further testified, " I said to Mr. Cole that the child has been wearing glasses and she also has a cold. I said, ' Can you cure her by Christian Science? ' and he said, ' Absolutely.' I said, ' Well, will you cure her? ' And he replied, ' Absolutely.' So I said that the child had a pair of roller skates, and wearing glasses, why, if she should fall she would injure herself. And he said, ' You take the glasses off and let the child run and romp like other children; ' that mothers should not put such fear in chil-

dren. *  *  * " He gave them treatment similar to the one he had given before.

The defendant during the interviews stated to the witness that she had as much power to heal disease as he had, and could do so as well if she would study the Bible and rely upon its promises and offer the prayer of understanding and faith. She understood him when he asserted that he could cure disease as saying that he could bring about the cure by means of prayer to Almighty God. He said to her that all diseases are alike to a Christian Scientist.

The defendant testified that at the first interview with the investigator " She told me that she had come to be treated for rouble with her eyes and stomach trouble. I informed her that Christian Science treatment was prayer to God, we did not believe in drugs, medical treatment, anything like that, and she asked me to give her treatment. Something was said in regard to the basis of Christian Science, and I told her substantially that Christian Science was the truth about God, and the truth about man and the truth about man's relationship to God and the truth of his birthright as a result of this relationship, which is the foundation of what we teach, and I told him that on this basis disease was no part of her birthright, or inharmony, and when she realized her oneness with God, and got in harmony with God that this was the treatment and was what we would do. She sat there for about fifteen minutes. I covered my face with my hands, or sat with my head partially bowed for fifteen minutes," in prayer.

He testified that at the second interview " She spoke to me about taking off her glasses and I told her that there was no reason that she should not take off her glasses, and I casually spoke of my own healing, that I had worn glasses for many years * * * and taken them off. *  *  * I told her I had trouble with my eyes and had several other diseases and that I had been to a number of physicians and that I had been healed

by Christian Science." He further testified that on the second visit he told her " That Christian Science treatment was prayer to God. I told her that Christian Science realized that God was omnipotent, or all powerful; that He was omniscient, or all knowing; that he was omnipresent, or ever present; and that because God was omnipotent and omniscient, and omnipresent, and God was good, that it must follow that evil, disease, inharmony, sin and discord were no part of His Being and had no real existence, and I told her that man was the image and likeness of God, and was entitled to dominion, and that his birthright was dominion and that he had the right to affirm and secure immunity from discord of whatever name and nature, and that disease was like a shadow that flees before the light."

He says he told her that this result would follow from spiritual understanding. He says he spoke to her about keeping her life pure and Christ-like and loving and good, and just and free from error. He says he then prayed again, and that prayer is a synonym for treatment.

He further testified that at the first interview " I told her I could not cure her, that I had no more power to cure her than any one else, that God was the only power, and the only healer. * * * I told her that she could cure herself just as much as I could if she would study and purify her life and her thoughts and cleanse from her consciousness fear and inharmony and false thoughts. I told her that by studying and gaining an understanding that she could apply the principle and law of Christian Science as well as anyone else, as well as I could. * * * I told her that I was nothing and that she was nothing, it was God."

His testimony as to what was said at the third interview is as follows: " We discussed Christian Science and I picked up Science and Health with Key to the Scriptures by Mrs. Eddy which is recognized in Christian Science as the standard text book; it is the original Christian Science text book which we

accept with the Holy Scriptures of which it is explanatory as the basis of our great religious truth. I asked her to procure a copy of this book." He testified that he read to her from that book. " To be ' present with the Lord ' is to have, not mere emotional ecstasy or faith, but the actual demonstration and understanding of Life as revealed in Christian Science. To be ' with the Lord ' is to be in obedience to the law of God, to be absolutely governed by Divine Love,—by Spirit, not by matter.

" Become conscious for a single moment that Life, and intelligence are purely spiritual—neither in nor of matter,— and the body will then utter no conscious complaints. If suffering from a belief in sickness, you will find yourselves suddenly well. Sorrow is turned into joy when the body is controlled by Spiritual life, Truth and Love. *   *   *

" Entirely separate from the belief and dream of material living, is the Life Divine, revealing spiritual understanding and the consciousness of man's dominion over the whole earth. This understanding casts out error, and heals the sick, and with it you can speak ' as one having authority.' "

He testified that he was practicing Christian Science as laid down by the church. He denied that he was practicing medicine.

It was conceded on the trial that Christian Science is a religion based upon the Scriptures and founded by Mary Baker Eddy in 1866 and that the church has about a million members. The alleged healing of moral, mental and physical diseases was practiced by Christian Scientists in New York for more than twenty years before the times mentioned in the indictment. It was also conceded that in order to obtain entry upon the list of practitioners of the Christian Science church proof must be furnished satisfactory to the church of the character and qualifications of the applicant, but that the education and experience of the applicant is not an element in his qualifications. The church relies wholly upon the sincerity of

the applicant and his reliance and faith in the power and efficacy of prayer to heal diseases.

It appears from the statute that we have quoted that a person practices medicine when he " holds himself out as being able to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition, and who shall either offer or undertake, by any means or method, to diagnose, treat, operate, or prescribe for any human disease, pain, injury, deformity or physical condition."

The language of the statute is very general.  It bears evidence in itself that the words were chosen for the express purpose of prohibiting, except upon registration and authorization of the practitioner, as by the statute provided, every means and method that could thereafter be used or claimed to be used to relieve or cure disease and infirmity by any person individually, or as a representative of a school, religious body or other organization.

It does not appear that the defendant attempted to diagnose the diseases which the investigator stated to him that she had; he not only in substance denied that she had any disease, but asserted that they rested in her imagination or were mere evidence of a lack of true relation to her God.  There was no inquiry on his part into the symptoms which the investigator claimed that she had as indicating the diseases.  There was no laying on of hands, manipulation, massage, or outward ceremonial.  His direction to her to remove her glasses and take off a porous plaster which she asserted she had upon her back were, as also asserted by him, simply to bring about complete reliance by her upon the power and willingness of God to heal her diseases.  Such directions were not, he asserts, intended as a prescription or as advice.  It was a test of her faith.  He, however, testified that prayer was a synonym for treatment. He habitually termed his interposition by prayer a treatment and such it would seem to have been in the ordinary meaning of

the word. He had a place where interposition by prayer to God could be sought through him at a price, either as a compensation or as an honorarium. He asserts that he made interposition with God by prayer to take away diseases or what he alleges to be wrong relationships between persons having diseases and their God. His interposition with God as explained by him was to obtain such Divine action that the inharmony between the Divine Being and the person who sought to be relieved of diseases and infirmities might be adjusted. The duties of the defendant as a practitioner would seem to have been to handle the claim of those that came to him with their ills with a view to obtaining a Divine cure. Such interposition under such circumstances was, in the language of the defendant himself, a " treatment."

We are of the opinion that the defendant did " treat " the investigator by " any (some) means or method," as the word is used in the general prohibition contained in the statute.

The general and comprehensive definition of a person who practices medicine has an express exception. The descriptive words are preceded by the phrase " except as hereinaftr statd." The exception concededly refers to the words in section 173 of the Public Health Law as follows: " This article shall not be construed to affect    *    *    *    the practice of the religious tenets of any church." The exception includes every person in the practice of the religious tenets of any church and it is not in any way in conflict with the Federal or State Constitution. The language quoted from said section 173 is not in any sense an affirmative license. It is, we repeat, an exception to the general prohibition. Whether the practice of the religious tenets of any church should have been excepted from the general prohibition against the practice of medicine unless the practitioner is registered and authorized so to do, or whether the exception should be continued therein, is a question for the legislature and not for the courts. The purpose of the general

statute is to protect citizens and others of the state from being treated in their physical ailments and diseases by persons who have not adequate or proper training, education or qualifications to treat them.

The tenets of a church are the beliefs, doctrines and creeds of the church. The exception relates to the tenets of the church as an organized body as distinguished from an individual. It does not relate to or except persons practicing in accordance with individual belief.

It appears from the record that it is a tenet of the Christian Science church that prayer to God will result in complete cure of particular diseases, in a prescribed, individual case. Healing would seem to be not only the prominent work of the church and its members, but the one distinctive belief around which the church organization is founded and sustained.

It is claimed that the church extends its influence and spreads knowledge of its power by practical demonstration on the part of its sincere practitioners in securing the overthrow of moral, mental and physical disease. It disclaims any reliance upon skill, education or science. In view of the tenets of the Christian Science church the exception to the prohibition in the statute is broader than the provision of the Constitution of this state which we have quoted and which permits the free exercise and enjoyment of religious profession and worship without discrimination or preference.

The exception in the statute is not confined to worship or belief but includes the practice of religious tenets. If it was the intention of the legislature to relieve members of the Christian Science and other churches from the provisions of sections 160 and 161 of the Public Health Law to the extent of permitting them within the rules, regulations and tenets of a church to maintain an office and there offer prayer for the healing of the diseases of those that might come to such church members for treatment, and the defendant has in good faith

acted in accordance therewith, he is not guilty of the crime alleged in the indictment.

The Christian Science church is in terms expressly excepted from the prohibition contained in the medical practice acts of many of the states. It is so expressly excepted in the statutes of Maine, New Hampshire, Massachusetts, Connecticut, North Carolina, North and South Dakota, Kentucky, Tennessee and Wisconsin.

We think the exception in the statute in this state is broad enough to permit offering prayer for the healing of disease in accordance with the recognized tenets of the Christian Science church. It may be said that if the exception is so construed, it will lead to numberless persons assuming to cure diseases in the name of a church for the purpose of thereby maintaining a business and securing a livelihood. The religious tenets of a church must be practiced in good faith to come within the exception. When such practice is a fraud or pretense it is not excepted from the general prohibition. When wrong is practiced in the name of religion it is not protected by Constitution or statute. (Reynolds v. U. S., 98 U. S. 145; Davis v. Beason, 133 U. S. 333; Morman Church v. U. S. 1.) Many of the decisions referred to by counsel may be explained by the fact that the persons therein severally considered were frauds and shams. (See People v. Spinella, 150 App. Div. 923; affd., 206 N. Y. 709.)

A person should not be allowed to assume to practice the tenets of the Christian Science or any church as a shield to cover a business undertaking. When a person claims to be practicing the religious tenets of any church, particularly where compensation is taken therefor and the practice is apart from a church edifice or the sanctity of the home of the applicant, the question whether such person is within the exception should be left to a jury as a question of fact. In this case the court charged the jury: " If you find from the evidence in this case

that this defendant did engage in the practice of medicine as alleged in the indictment, within the definition which I have given to you, it is no defense that he did what he did from any sense of duty, or that he did these acts in the practice of the religious tenets of the Christian Science church." We are of the opinion that the court was in error in so charging the jury. The exception was intended by the legislature to exclude from the prohibition the practice of the religious tenets of the Chirstian Science and other churches. It was necessary as we have seen that the practice be of the tenets of a recognized church and the court, instead of charging the jury as stated, should have left to the jury, the question whether the defendant was in good faith practicing the tenets of such a church within the meaning of the stautory exception.

The judgment should be reversed and a new trial ordered.

CUDDEBACK and CARDOZO, JJ., concur; WILLARD BARTLETT, Ch. J., concurs in the following memorandum: I concur in Judge's CHASE's construction of the statute. But I would go farther. I deny the power of the legislature to make it a crime to treat disease by prayer; COLLIN, J., not voting; HOGAN J., absent; SEABURY, J., not sitting.

Judgment reversed, etc.