*228 OPINION OF THE COURT
Benjamin Glass, J.
The defendant, having been charged with the unlawful practice of medicine, moves this court for an order dismissing the complaint upon the ground that the statute defining the offense charged is unconstitutional and otherwise invalid pursuant to CPL 170.35.
The charges stem from the allegations that the defendant, as president of Syntho Hair International, Ltd., offered for a fee in a newspaper article, hair implants for people with baldness. The procedure, as performed by the defendant, involved a number of steps — marking the part of the scalp where the implant was to be inserted; injecting the scalp with an anesthetic; implanting synthetic hair fibers by attaching 3 or 4 fibers to a needle and injecting the needle into the scalp; removing the needle leaves the fibers in the scalp. This whole process is then repeated a number of times. It is further alleged that when one of the subjects of this procedure later complained of a possible scalp infection, he was told by the defendant that there was no infection and was given antibiotic pills.
By his motion, the defendant raises a question of first impression with respect to a novel procedure — Does the phrase "the practice of medicine” as set forth under sections 6512, 6521 and 6522 of the Education Law encompass the defendant’s activities in the performance of a synthetic hair implantation procedure? An investigation of the general process termed "synthetic hair implantation” to determine its nature, process and effects was conducted. The results of that inquiry mandate that the public be made aware of the health hazard inherent to that procedure. This court is, of course, aware of the presumption of innocence and in nowise is this discussion to be viewed as an assertion that the defendant committed any of the actions or engaged in any of the activities discussed below.
Persons suffering from alopecia (baldness) have subjected themselves to various techniques in desperate attempts to restore their lost hair with results ranging from fair to disastrous. Excluding the use of wigs and toupees, the most commonly used methods of hair restoration include the hair weave, hair transplantation, suture implantation, and synthetic hair implantation. The hair weave involves weaving a *229 toupee into the scalp hairs usually providing a good cosmetic effect depending on its density but often resulting in a traction type of baldness.[1] Natural hair transplantation, the most widely used permanent hair restoration technique, is a generally accepted medical procedure as practiced by dermatologists, plastic surgeons, general surgeons, and others. It involves the surgical transfer of cylindrical full-thickness skin grafts from hair-bearing areas of the treated person’s own scalp to a bald area.[2] This punch grafting or autografting has been used for many years by reputable physicians with little adverse medical effect and fairly good cosmetic effect.[3]
The two remaining techniques are similar in the respect that both involve the introduction of foreign material into the scalp skin. The suture implant requires running stainless steel or other synthetic material sutures in a circular pattern on the scalp to which the artificial "hairs” are attached. Adverse medical effects are not uncommon and complications often arise including foreign-body tissue reaction.[4]
In the instant case, it is alleged that the defendant employed the synthetic hair implantation method and, thereby, violated the restrictions on the practice of medicine.
The idea behind the procedure is fairly simple — sewing synthetic fibers which look like hair, into a person’s scalp to cover the bald area.[5] In practice, a local anesthetic is injected via hypodermic or jet propulsion as often as needed. Single or several strands of fiber, usually acrylic wig fibers bought from local wig distributors are threaded into a curved surgical needle. The needle is then inserted deeply into the scalp and pulled up through the skin. After this looping at a site, a knot is made close to the scalp in one of the arms of the loop. By a see-saw motion the knot is pulled into the skin below the surface and anchored there.[6] (Other methods include using hooked/barbed fibers and pushing looped fibers under the skin with the hope that fibrous tissue will form to hold them in *230 place.)[7] Depending upon the size of the bald area and the instruments used, the rate of implantation ranges from 100 to 300 fibers per hour to 500 to 3,600 fibers within hours or days.[8]
After completion of the implant process, the subject has about one week to enjoy the results before the nightmare begins. This procedure has proven to be the most dangerous and health-threatening hair restoration procedure developed to date. The immediate effects are a sore scalp and swollen face, fibers begin to break off in multiples, and infection sets in. Complaints to the clinics usually resulted in reimplanting the lost fibers, providing oral antibiotics and sending the subject home. The infection might hold off for awhile but invariably the process begins again.[9]
If this implant procedure is used, recognized medical studies have shown that the list of complications is long and painful— marked facial edema, bleeding, foreign body reaction, infection, spontaneous loss of fibers, pain, numbness, itchiness, natural hair loss, severe scarring and more. There have been cases of resulting endocarditis (inflammation of the lining of the heart and its valves) and osteomyelitis (inflammatory disease of the bone). Concern is great that the future holds progressive postinflammatory sclerosing (hardening of tissue) and carcinoma of the scalp.[10]
Efforts by dermatologists to repair the damage usually begin with trying to control the infections which do not always respond to antibiotics and removing any remaining fibers. Removal is almost impossible when the knot technique was utilized. In many cases, the entire scalp has been removed in a Juri flap operation whereby scalp flaps, raised from hair-bearing areas, are rotated and sutured onto rionhair-bearing areas covering the scarring.[11] The full extent of physical and psychological damage cannot be determined at this time but it may be considered life threatening in many cases.
The Food and Drug Administration (FDA) and the Federal Trade Commission have held hearings on the fiber implanta *231 tian business because of the numerous complaints received. Under FDA regulations the synthetic fibers, commonly manufactured for use in wigs, are subject to their authority only when used as hair implants and regarded as medical devices.[12] The procedure itself falls within the province of the Bureau of Medical Devices of the FDA.[13] On March 30,1979, the Surgical Devices Panel of the FDA unanimously determined that the fibers used and the procedure itself were unsafe and dangerous.[14]
The complaint herein, which consists of the affidavits of a special investigator and of the two subjects of the procedure, sets forth basic facts as salient features of what occurred. Whether or not, thereby, the crimes charged are sufficiently set forth must be ascertained by an examination of the controlling provisions relating to the practice of medicine which appear in the Education Law.
Section 6512 of the Education Law stated that "Anyone not authorized to practice * * * or holds himself out as being able to practice in any profession in which a license is a prerequisite to the practice of the acts, or who practices any profession as an exempt person during the time when his professional license is suspended, revoked or annulled, or who aids or abets an unlicensed person to practice a profession, or who fraudulently sells, files, furnishes, obtains, or who attempts fraudently to sell, file, furnish or obtain any diploma, license, record or permit purporting to authorize the practice of a profession, shall be guilty of a class A misdemeanor.”
Section 6521 of the Education Law states that "The practice of the profession of medicine is defined as diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition.”
Section 6522 of the Education Law states that "Only a person licensed or otherwise authorized under this article shall practice medicine or use the title 'physician’.”
This court would not hesitate to pass upon the constitutionality of a statute if the rights of a defendant are violated. "To declare a law unconstitutional, it must appear, even under the present conception of constitutional law, either that the Legis *232 lature had no power to act upon the subject-matter, or having such power, it was exercised in an arbitrary, unreasonable, discriminatory or capricious manner, and that the methods adopted have no reasonable relation to the subject-matter or to the achievement of the result desired.” (People v Lee, 151 Misc 431, 434.)
Of course, a statute must be sufficiently definite to give a reasonable man subject to it notice of the nature of what is prohibited and what is required of him. (People v Byron, 17 NY2d 64, 67; Lanzetta v New Jersey, 306 US 451.) Moreover, in order to be upheld as constitutional, a law which places some restriction upon an individual’s freedom of action in the name of the police power must bear some reasonable relation to the public good. (People v Bunis, 9 NY2d 1, 4.)
There is a strong presumption that a statute duly enacted by the Legislature is constitutional. Indeed, it has been held that in order to declare a law unconstitutional, the invalidity of the law must be demonstrated beyond a reasonable doubt. (Matter of Van Berkel v Power, 16 NY2d 37, 40.)
In Dent v West Virginia (129 US 114) the United States Supreme Court upheld the constitutionality of the medical practice acts enacted by the various States.
People v Cole (219 NY 98, 109-110) stated that the purpose of the general statute (Public Health Law, former § 161), basically similar to the instant statute, "is to protect citizens and others of the state from being treated in their physical ailments and diseases by persons who have not adequate or proper training, education or qualifications to treat them.”
As the law stands today, it simply requires that before a person can practice medicine, he must comply with the same education requirements as does the doctor of medicine.
"Usually, statutes aimed at promoting the public good receive a liberal construction and are construed in such a manner as to accomplish their intent.
"It must be remembered that this court of first instance is guided by certain established concepts. Among them is that courts should not determine unconstitutionality unless that result is clearly required. Another dogma presumes statutory validity and the party challenging has the burden of showing unconstitutionality (McKinney’s Cons Laws of NY, Book 1, Statutes, § 150, subds a, b).” (People v Hinman, 86 Misc 2d 685, 687.)
*233 "[I]t is the function of the courts thus to interpret the law as to carry out the intentions of the Legislature which in the present statutes intended to protect and preserve the health of the people of the community from the menace of the ignorant, the unprepared, the quacks and the fakers.” (People v Steinberg, 190 Misc 413, 415.)
The courts have denounced in the past and will denounce in the future those who attempt to circumvent the medical regulations. As stated in People v Mulford (140 App Div 716, 719, affd 202 NY 624): "A patient may often suffer as well from a failure to prescribe proper remedies, or afford surgical relief promptly, as from making improper prescriptions, or performing unskillful operations. A physician who holds himself out to treat patients for physical ills, should know whether to do anything and what to do to relieve his patient, otherwise he should not be permitted to practice, and impose upon the unfortunate sufferers who like the poor are always with us, and many of whom need the protection of the State, against quacks in and out of the profession of medicine. I have no sympathy with this class of practitioners who seek to remain outside the control of the State, for the welfare of the people.”
There is no question that the State Legislature has the power to regulate the practice of medicine.
Defendant’s contention is that it does not appear that he held himself out to be able to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition. Since that is indisputably an element of the offense charged, it must be established in addition to an undertaking or offer to perform any one of the acts.
People v Lee (151 Misc 431, 433, supra) stated that:
"An information is merely an allegation made to a magistrate that a crime has been committed by a designated person. It is the basis for the issuance of a warrant and for the jurisdiction of the court. In its form and substance it does not have to comply with the same strict formality as an indictment. Nevertheless, it must state facts sufficient to constitute a crime. * * *
"The defendant is charged with practicing medicine unlawfully. 'Practicing,’ as used in the statute under consideration, should be given the commonly accepted meaning of that word, viz., the habitual doing of certain things, the doing of an act *234 more than once, and while one act of diagnosis or treatment might constitute the offense alleged, nevertheless the statute clearly indicates that repeated acts of diagnosis and treatment at different times and upon different persons constitutes the practice which the statute aims at and may be prosecuted as one offense.”
It appears from all the many cases researched in this area, that the question, of whether or not a defendant has violated the restrictions on the practice of medicine, is to be ultimately answered by the trier of fact upon the evidence adduced. Since it is a question of some complexity many pertinent factors must be examined and weighed to determine if a defendant’s activities fall within the definition — Was there a diagnosis determining a disease, infirmity or physical condition? Was a remedy or treatment prescribed? Were the act or acts performed by the defendant such as to endanger the public health? Did the defendant invade the territory of the profession by specific actions solely within the province of a duly trained and knowledgeable medical practitioner? The answers to these questions will assist the trier of fact in the determination of whether the defendant’s activities constituted the practice of medicine.
As noted by the court in People v Kaiser (206 App Div 780, 780-781): "It was error for the court to find, as it did, on the undisputed facts as a matter of law that the defendant was guilty of a violation of the statute, as complained of. Whether he was guilty of practicing medicine without a license, within the meaning of the statutory exception, was a question of fact to be determined on all the evidence adduced on the trial.”
The Appellate Division in People v Dennis (271 App Div 526) found a conviction warranted where a licensed massage operator employed by a physiotherapist infringed upon the medical profession by applying heat treatments without massage, suggesting X rays, diagnosing a condition, and taking blood pressures. In Rickman v Terminal Barber Shops (180 Misc 319) the court found that the use of an electric machine in rendering reducing treatments solely to beautify the body did not require the operator to be licensed as physiotherapists, nor did it qualify as the practice of medicine. The decision, however, appears based upon the fact that the treatments did not differ in essence from treatments with electrical appliances by unlicensed beauticians which have been held legal in this State. The court further stated that, although such *235 evidence was absent in this case, it could readily conceive of circumstances whereunder the defendant could practice medicine illegally in the operation of these machines.
Defendant has contended that the process used by him is more akin to electrolysis which has been found not to be the practice of medicine. People v Lehrman (251 App Div 451) held that the statutes were never intended to cover this type of beauty culture. There is, however, no major intrusion into the integrity of the human body by the needles in this process (i.e., electrolysis). In the case of accupuncture (People v Amber, 76 Misc 2d 267) the court held that as relating to this process — the applications of cauterizations and piquers or insertions of needles into the human body to relieve pain or physical trouble — the statutes were designed to prevent such conduct as indiscriminate cauterization and sticking of needles into human beings by unskilled and unlicensed practitioners.
"[A] statute intended to regulate, limit or control the diagnosis and treatment of ailments must necessarily be broad enough to include the gamut of those known, whether or not recognized and even those not yet conjured. * * *
"The court finds nothing in the pertinent provisions of the Education Law which exclude, directly or by implication, any manner of diagnosis or treatment which is not embraced within the definition of 'Western allopathie medicine’. On the contrary, and to put it more positively, the definition of medicine as set forth in section 6521 of the Education Law specifically includes the 'diagnosing, treating, operating, or prescribing for any human disease, pain, injury, deformity or physical condition.’ Whether actions constitute the practice of medicine is dependent upon the facts and not upon the name of the procedure, its origins or legislative lack of clairvoyance.” (People v Amber, supra, p 273.)
It is possible, based upon evidence to be adduced at a trial, that the trier of fact could find a direct or inferential holding out by the defendant that he was able to perform one or more of the prohibited acts. Factors that would be relevant in the final determination could include the physical setup of the defendant’s office; the presence of persons who appear to be nurses or doctors; questions concerning any allergies or reactions to anesthetics; the description of the procedure to be utilized; and the possible results or effects to be anticipated at the procedure’s conclusion.
Aside from the direct holding out, there could be found an *236 implied holding out from the acts performed, i.e., actual injections into the scalp of local anesthetics; piercing the scalp with a needle similar to a suture; implanting of the synthetic fibers (foreign bodies) within the integrity of the human body; diagnosing the presence or absence of an infection; and the providing of antibiotic pills to combat a possible infection.
The defendant’s motion to dismiss this action is, hereby, denied. The court finds that the statute is a constitutional exercise of the legislature’s power to regulate for the protection of the public welfare and that the issue raised is a question of fact to be determined upon all the evidence adduced at a trial.

. Lepaw, Hair Implant Complications, CUTIS 11:88, Jan., 1973, p 88.

. Hanke & Bergfeld, Fiber Implantation for Pattern Baldness, J AMA 241:146, Jan., 1979, p 148.

. Gonzalez & McBride, Synthetic hair implantations continue; serious complications result. Medical News. J AMA 241:2687, June, 1979, p 2687.

. Lepaw, Complications of Implantation of Synthetic Fibers into Scalps for “Hair” Replacement, J Dematol Surg Oncol, 5:201, March, 1979.

. Hanke & Bergfeld, supra, at p 148.

. Lepaw, J Dematol Surg Oncol, supra, at p 202.

. deVries, Scalped victims left with infection and scars in worst hair fraud ever, Medical Post, Toronto, July 17,1979.

. Lepaw, J Dematol Surg Oncol, supra, at p 202.

. Gonzalez & McBride, supra, at p 2687.

. Lepaw, Commentary, The Synthetic Fiber Implant Scam, Inti J Dermatology 18:468, July-Aug., 1979.

. Gonzalez & McBride, supra, at p 2688.

. FDA Consumer, News Highlights — Data Asked on Synthetic Hair, May, 1979, p 32.

. Gonzalez & McBride, supra, at p 2688.

. Lepaw, Inti J Dermatology, supra, at p 471.