The FOUNDING CHURCH OF SCIEN-
TOLOGY OF WASHINGTON,
D. C., et al., Appellants,

v.

UNITED STATES of America,
Appellee.

No. 21483.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 5, 1968.

Decided Feb. 5, 1969.

Petition for Rehearing Denied
April 18, 1969.

**1148**

Mr. Oscar H. Brinkman, Washington, D. C., for appellants.

Mr. Nathan Dodell, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker, Asst. U. S. Atty., William W. Goodrich, Assistant General Counsel, Department of Health, Education and Welfare, and Joanne S. Sisk, Attorney, Department of Health, Education and Welfare, were on the brief, for appellee.

Before WRIGHT, McGOWAN and ROBIN-SON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

This is an appeal from a judgment and decree of condemnation and destruction against several electrical instruments and a large quantity of literature owned by claimants-appellants, The Founding Church of Scientology of Washington, D. C. and various individual adherents of that organization. The instruments and literature were seized by the Food and Drug Administration as "devices" with accompanying "false and misleading labeling" subject to condemnation under the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (1964). The Government further charged that the instruments were "devices" lacking "adequate directions for use," in further violation of the Act.[1] After a jury trial, a general verdict "for the Government" was returned, and a judgment and decree of condemnation was entered.

Appellants contend that the seizure of the articles violated their Fourth Amendments rights, that the proceedings interfered with the free exercise of their religion, and that the evidence was insufficient to sustain the verdict. Because we find that much of the literature re-

---

1. "Any * * * device * * * that is * * * misbranded * * * while in interstate commerce * * * shall be liable to be proceeded against * * * and condemned in any district court of the United States within the jurisdiction of which the article is found * * *."

21 U.S.C. § 334(a).

"A drug or device shall be deemed to be misbranded—

"(a) False or misleading label.

"If its labeling is false or misleading in any particular.

* * * * *

"(f) Directions for use and warnings on label.

"Unless its labeling bears (1) adequate directions for use * * *."

21 U.S.C. § 352.

"The term 'interstate commerce' means * * * (2) commerce within the District of Columbia * * *."

21 U.S.C. § 321(b).

lied on by the Government to establish misbranding was not "labeling" [2] within the meaning of the statute as interpreted in the light of the First Amendment, we reverse.

## I

At the outset, we confront appellants' claim that the disputed instruments and literature, the *res* of this lawsuit, were seized in violation of the Fourth Amendment. The Act provides that misbranded devices "shall be liable to be proceeded against * * * on libel of information," [3] and that such devices "shall be liable to seizure by process pursuant to the libel, and the procedure in cases under this section shall conform, as nearly as may be, to the procedure in admiralty * * *." [4] The applicable procedure in admiralty at the time of the seizure was provided in former Admiralty Rule 21, the text of which is set out in the margin.[5]

The Government complied with the procedures required by statute and rule in this case. Pursuant to the inspection provisions of the Act, FDA agents visited the Founding Church of Scientology, obtained a demonstration of the instrument later seized, and bought copies of the literature later alleged to be "labeling" of the instrument. The United States Attorney then filed a libel of in-

formation with the District Court, describing the instrument and literature and averring that together they constituted a "device" and accompanying "false or misleading labeling" subject to condemnation under the Act. The court ordered issuance of a warrant authorizing seizure of the instruments and literature, and public advertisement of the seizure. FDA agents and United States Marshals carried out the seizure on January 4, 1963, at various premises owned by appellant Founding Church and its affiliates, after service of the warrant of attachment.

Appellants [6] contend that seizures such as this are governed by the warrant clause of the Fourth Amendment, which provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Since in appellants' view the warrant of seizure was not issued "upon probable cause, supported by Oath or affirmation," they contend that the exclusionary rule bars the use in evidence in a condemnation proceeding of the matter seized.

In arguing the Fourth Amendment issue, the parties have concentrated chiefly upon the question whether the exclusionary rule applies to condemnation proceedings under the Act.[7] Because we find

2. As defined in 21 U.S.C. § 321(m), the text of which is set out in Note 15, *infra*.

3. 21 U.S.C. § 334(a).

4. 21 U.S.C. § 334(b).

5. "All informations and libels of information upon seizures for any breach of the revenue, or navigation or other laws of the United States, shall state the place of seizure, whether it be on land or on the high seas, or on navigable waters within the admiralty and maritime jurisdiction of the United States, and the district within which the property is brought and where it then is. The information or libel of information shall propound in distinct articles the matters relied on as grounds or causes of forfeiture, and aver the same to be contrary to the form of the statute or statutes of the United States in such

case provided, as the case may require, and shall conclude with a prayer of due process to enforce the forfeiture, and to give notice to all persons concerned in interest to appear and show cause at the return day of the process why the forfeiture should not be decreed."

7A J. MOORE, FEDERAL PRACTICE ¶ .30, p. 236 (2d ed.1968).

6. Appellants appeared as claimants to the seized goods in the District Court, and demanded a jury trial, under 21 U.S.C. § 334(b).

7. *See* One 1958 Plymouth Sedan v. Com. of Pennsylvania, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965); Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *but see* United States v. 2000 Plastic Tubular Cases, etc., 3 Cir., 352 F.2d 344 (1965), *cert. denied*, 383 U.S. 913, 86 S.Ct. 891, 15 L.Ed.2d 667 (1966).

that the seizure in this case was "reasonable" under the applicable Fourth Amendment standards, we do not reach that question.

■ The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." It gives procedural form to this sweeping protection through the warrant clause, which requires that a magistrate review the decision to arrest or search except in exigent cases. The often stated purpose of this requirement is to interpose a relatively detached and independent decision maker between the privacy of the individual and the otherwise unchecked zeal of enforcement officials.[8]

■ Though warrants are generally necessary for arrests of persons and for searches, the warrant requirement has not traditionally been imposed upon seizures of the type involved in this case—attachment of property in the course of civil proceedings. This does not mean that the Fourth Amendment does not apply to such seizures, in both its substantive prohibition against unreasonable seizures and its procedural requirement of judicial or quasi-judicial review of the decision to seize. It means merely that judicial restraint is imposed through a different form of proceeding than the showing of probable cause before a magistrate. In the case of ordinary civil attachments, the details of such proceedings are, even in the federal courts, left to state law.[9] In cases in admiralty, the process is governed by the Admiralty Rules, lately recodified as a supplement to the Civil Rules.[10]

Tradition has sanctified these forms and processes of civil attachments, and they have not been subjected to much Fourth Amendment scrutiny in either litigation or scholarly literature. We need not review them generally now, however, for we find that this particular seizure was reasonable in both the grounds supporting it and the judicial supervision over the decision to make it.

■ The libel of information filed by the United States Attorney particularly described the items to be seized, and gave a reasonably particular account of the respects in which they were thought to contravene the Act.[11] Though the libel was not a verified complaint, it has been held that in admiralty complaints signed by Government officers are attested to by the officer's oath of office.[12] The libel was subject to scrutiny by a United States District Judge, and it was only after his review and by court order that the warrant issued. In these circumstances, all requirements imposed by the Fourth Amendment were complied with.[13]

8. Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 532–533, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

9. Rule 64, Fed.R.Civ.P.

10. Supplemental Rules B and C, Fed.R. Civ.P.

11. The libel alleged that the "Hubbard Electrometers" were accompanied as labeling by a list of named books and pamphlets, which were alleged to claim that the E-meter could be used in the cure or treatment of a list of named diseases, claims alleged to be false and misleading.

12. United States v. 935 Cases, etc., of Tomato Puree, 6 Cir., 136 F.2d 523, 525, cert. denied, 320 U.S. 778, 64 S.Ct. 92, 88 L.Ed. 467 (1943).

13. Appellants also contend that the seizure was the fruit of an illegal search in the form of a visit to the Scientology headquarters four years previously by an FDA agent passing as a member of the general public. There was no showing that the previous visit bore any relationship to the seizure in this case, and in any event inspections of premises open to the general public are not illegal searches. Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). Appellants also contend that the seizure was carried out in an unreasonable manner, but on examination of the record we find this contention to be without merit.

## II

We turn then to the merits of the Government's case against the instruments and literature subject to the decree of condemnation. The Government has charged that the instruments seized, Hubbard Electrometers or "E-meters," are "devices" as defined in the Act [14]; that the literature seized constitutes "labeling" of the device, in that it is "written, printed, or graphic matter * * * accompanying" the device [15]; and that this "labeling" is false or misleading. Because our reading of the Act in its application to this case is influenced by appellants' claims to the free exercise of their religion, some background concerning their movement becomes necessary.

A. Appellants in this case, claimants to the seized materials, are individual and corporate adherents to the movement known as Scientology. The movement apparently rests almost entirely upon the writings of one man, L. Ron Hubbard, an American who maintained the headquarters of the movement in England at the time this action was brought. In the early 1950's, Hubbard wrote tracts elucidating what he called "Dianetics." [16] Dianetics is a theory of the mind which sets out many of the therapeutic techniques now used by Scientologists, including techniques attacked by the Government in this case as false healing.

The basic theory of Dianetics is that man possesses both a reactive mind and an analytic mind. The analytic mind is a superior computer, incapable of error, to which can be attributed none of the human misjudgments which create social problems and much individual suffering. These are traceable rather to the reactive mind, which is made up of "engrams," or patterns imprinted on the nervous system in moments of pain, stress or unconsciousness. These imprinted patterns may be triggered by stimuli associated with the original imprinting, and may then produce unconscious or conditioned behavior which is harmful or irrational.[17]

Dianetics is not presented as a simple description of the mind, but as a practical science which can cure many of the ills of man. It terms. the ordinary person, encumbered by the "engrams" of his reactive mind, as a "preclear," by analogy to a computer from which previously programmed instructions have not been erased. The goal of Dianetics is to make persons "clear," thus freeing the rational and infallible analytical mind. The benefits this will bring are set out in considerable and alluring detail. All mental disorders are said to be caused by "engrams," as are all psychosomatic disorders, and that concept is broadly defined.[18]

A process of working toward "clear" is described as "auditing." This process was explicitly characterized as "therapy" in Hubbard's best-selling book DIANET-

---

**14.** "The term 'device' * * * means instruments, apparatus, and contrivances, including their components, parts, and accessories, intended (1) for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; or (2) to affect the structure or any function of the body of man or other animals."
21 U.S.C. § 321(h).

**15.** "The term 'labeling' means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."
21 U.S.C. § 321(m).

**16.** DIANETICS: THE EVOLUTION OF A SCIENCE (1958) (a work which apparently appeared in ASTOUNDING SCIENCE FICTION magazine in 1950—*see* A BRIEF BIOGRAPHY OF L. RON HUBBARD 8 (author not given, 1959); DIANETICS: THE MODERN SCIENCE OF MENTAL HEALTH (1950); SCIENCE OF SURVIVAL: PREDICTION OF HUMAN BEHAVIOUR (1951). In this and succeeding footnotes, where author is not given, the author is L. Ron Hubbard.

**17.** An exposition of the "fundamentals of Dianetics" of relative clarity and brevity is to be found in the publisher's introduction to SCIENCE OF SURVIVAL, *supra* Note 16, at i-viii.

**18.** DIANETICS: THE MODERN SCIENCE OF MENTAL HEALTH, *supra* Note 16, at 91–108.

ics: THE MODERN SCIENCE OF MENTAL HEALTH (1950). The process involves conversation with an "auditor" who would lead the subject or "preclear" along his "time track," discovering and exposing "engrams" along the way. Though auditing is represented primarily as a method of improving the spiritual condition of man, rather explicit benefits to bodily health are promised as well. Hubbard has asserted that arthritis, dermatitis, asthma, some coronary difficulties, eye trouble, bursitis, ulcers and sinusitis are psychosomatic and can be cured, and further that tuberculosis is "perpetuated by engrams." [19]

A few years after the appearance of Dianetics, Hubbard began to set forth the broader theories of Scientology. Dianetics was explicitly endorsed as part of Scientology, "that branch * * * that covers Mental Anatomy." [20] Testimony by Scientology adherents at the trial made clear that they continue to uphold the theories of Dianetics, though they feel that there may have been some errors in early formulations.

With Scientology came much of the overlay which lends color to the characterization of the movement as a religious one. Hubbard has claimed kinship between his theories and those espoused by Eastern religions, especially Hinduism and Buddhism.[21] He argues that man is essentially a free and immortal spirit (a "thetan" in Scientological terminology) [22] which merely inhabits the "mest body" ("mest" is an acronym of the words matter, energy, space, time).[23] Man is said to be characterized by the qualities of "beingness," "havingness,"

and "doingness." [24] The philosophical theory was developed that the world is constructed on the relationships of "Affinity," "Reality" and "Communication," which taken together are denominated "the ARC Triangle." [25]

On the more mundane level, early in the career of Scientology Hubbard's followers—at least those in the United States—began to constitute themselves into formal religious bodies. The Founding Church of Scientology of Washington, D. C., one of the appellants, was incorporated in the District of Columbia in 1955. A formal creed was promulgated and was made part of the Articles of Incorporation. From the literature of the movement in evidence at trial, it appears that the move toward formal religious organization disturbed some adherents of Scientology, who seem to have regarded it as an attempt to provide a legal cloak for the movement's activities. But Hubbard defended the church movement, disavowing mysticism or supernaturalism, but pointing out the kinship of his ideas with those of the Vedas and other Eastern religious doctrines.[26]

From the evidence developed at trial, it appears that a major activity of the Founding Church and its affiliated organizations in the District of Columbia is providing "auditing," at substantial fees (at the time of trial $500 for a 25-hour course), to persons interested in Scientology. The affiliated Academy of Scientology is engaged in training auditors. Auditors are paid directly by the Church. There is no membership in the Church as such; persons are accepted for auditing on the basis of their interest in Scientol-

19. *Id.* at 92–93. In a later work, Hubbard brought cancer within the scope of treatment by "auditing." *See* SCIENTOLOGY: A HISTORY OF MAN 21 (4th ed. 1961).

20. *See* SCIENCE OF SURVIVAL, *supra* Note 16, at 1 n. 1 (apparently a footnote inserted into a later printing of this pre-Scientology book).

21. *See, e.g.,* L. RON HUBBARD'S PAB's, BOOK III 14–20 (1956).

22. *See* SCIENTOLOGY: THE FUNDAMENTALS OF THOUGHT 32 (1956).

23. *See* SCIENTOLOGY 8–8008 at 13–19 (3d ed.1956).

24. *See* SCIENTOLOGY: THE FUNDAMENTALS of THOUGHT, *supra* Note 22, at 16.

25. *See* SCIENTOLOGY 8–8008, *supra* Note 23, at 20–44.

26. For Hubbard's account of this dispute, see L. RON HUBBARD'S PAB's, BOOK III, *supra* Note 21, at 14–20.

ogy (and presumably their ability to pay for its benefits).

The Hubbard Electrometer, or E-meter, plays an essential, or at least important, part in the process of auditing. The E-meter is a skin galvanometer, similar to those used in giving lie detector tests. The subject or "preclear" holds in his hands two tin soup cans, which are linked to the electrical apparatus. A needle on the apparatus registers changes in the electrical resistance of the subject's skin. The auditor asks questions of the subject, and the movement of the needle is apparently used as a check of the emotional reaction to the questions. According to complex rules and procedures set out in Scientology publications, the auditor can interpret the movements of the needle after certain prescribed questions are asked, and use them in diagnosing the mental and spiritual condition of the subject. The E-meters are sold for about $125, and are advertised in Scientology publications available at the Distribution Center adjoining the Church.

The Scientology movement in the District of Columbia also offers the entire range of Scientology publications for sale. Over the years this literature has grown into a formidable *corpus*. Hubbard's two early books on Dianetics are sold, along with later treatises developing Scientology. A large number of pamphlets and tracts supplements the hardcover books. The movement has a monthly magazine, ABILITY, which at the time of trial had published over 100 numbers. In addition, "L. Ron Hubbard's Professional Auditors' Bulletins," numbering at least 80 at the time of trial, are collected and published in pamphlets. Much of this literature is before the court as exhibits in evidence, and a large proportion of it stands condemned by the District Court's decree as "false or misleading labeling" of the E-meter.[27]

B. With this factual background in mind, we turn to the litigation of this case in the District Court. The Government has framed this as a typical Food, Drug and Cosmetic Act case, involving a device whose accompanying promotional literature makes claims to curative powers unsupported in fact. The Government has culled from the vast literature of Scientology a large number of statements which assert or imply that "engrams" or the "reactive mind" cause various conditions, mostly those normally considered mental or psychosomatic disorders, but also including diseases or conditions which standard medical opinion would regard as organic. Further statements have been found asserting that auditing or processing, in clearing away the "engrams," can cure or alleviate these conditions. And finally statements have been introduced indicating that the E-meter is essential to, or at least useful in, auditing or processing. On this basis, the Government claims to have shown that the E-meter is a "device" within the meaning of the Act, in that it is "intended * * * for use in the diagnosis, cure, mitigation, treatment, or prevention of disease * * *." 21 U.S.C. § 321(h).

The Government put on a series of expert witnesses. First, physicists and engineers testified concerning the E-meter itself. They found it to be a crude skin galvanometer, of reasonably craftsmanlike design and construction, though with certain serious defects if meant to be used as a research tool for meaningfully measuring electrical skin resistance.

Next, a series of doctors and medical researchers and a psychiatrist testified that, within their expert knowledge, there was no use for such an instrument in the diagnosis or treatment of any disease or mental disorder. They were asked about the specific diseases or conditions claimed in the Scientology litera-

27. In an appendix to its decree the District Court listed the works found to make false claims respecting the curative powers of auditing and ordered them condemned along with the E-meter. Since we conclude that the judgment of the court must be reversed *in toto*, we do not reach appellants' claim that the Act does not authorize condemnation of labeling, especially "labeling" which takes the form of general literature.

ture to be susceptible of alleviation through auditing, and unanimously agreed that none of these could be treated or helped in any way through any known use of the E-meter.[28]

In its legal arguments the Government has contended from the outset that whether or not Scientology is a religion, and whether or not auditing or processing is a practice of that religion, are entirely irrelevant to the case. Religious beliefs, it is argued, are entirely protected by the First Amendment, but action in the name of religion is susceptible to legal regulation under the same standards and to the same degree as it would be if entirely secular in purpose.

Appellants have argued from the first that the entire case must fall as an unconstitutional religious persecution. In their view, auditing or processing is a central practice of their religion, akin to confession in the Catholic Church, and hence entirely exempt from regulation or prohibition. They have made no attempt to contradict the expert testimony introduced by the Government. They have conceded that the E-meter is of no use in the diagnosis or treatment of disease as such, and have argued that it was never put forward as having such use. Auditing or processing, in their view, treats the spirit of man, not his body, though through the healing of the spirit the body can be affected. They have culled from their literature numerous statements disclaiming any intent to treat disease and recommending that Scientology practitioners send those under their care to doctors when organic defects may be found. They have introduced through testimony a document which they assert all those who undergo auditing or processing must sign which states that Scientology is "a spiritual and religious guide intended to make persons more aware of themselves as spiritual beings, and not treating or diagnosing human ailments of body or mind, and not engaged in the teaching of medical arts or sciences * * *."

Finally, with respect to their claim to be a religion and hence within the protection of the First Amendment, they have shown that the Founding Church of Scientology is incorporated as a church in the District of Columbia, and that its ministers are qualified to perform marriages and burials. They have introduced their Creed into evidence. The Government has made no claim that the Founding Church is not a *bona fide* religion, that auditing is not part of the exercise of that religion, or that the theory of auditing is not a doctrine of that religion.

C. Thus both parties have viewed the religious issue as a simple one. In the Government's view, religion is simply irrelevant—appellants have engaged in "action" and hence stripped themselves of any First Amendment protection. In appellants' view, religion is dispositive—auditing is part of the practice of their faith and hence the free exercise clause protects it from all secular regulation. In our view, the religious issue is more complex than either of the parties has maintained.

First, it is clear that the First Amendment does not protect from regulation or prohibition all *bona fide* religious practices. As the Supreme Court has stated:

"* * * [The First Amendment] embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct re-

28. One Government witness, a psychophysiologist and neurophysiologist, did testify that there is a connection between stimuli, including mental or emotional stimuli, and skin resistance. He stated: "The good skin resistance devices have been used as a research tool and only very occasionally as a clinical tool to try to discover areas of emotional con- flict within an individual who is characterized by a neurotic ailment, if that is the correct word to use here." However, the witness did not consider the E-meter a "good skin resistance device" because its needle reacted to such irrelevant factors as the tightness with which the subject held the soup cans.

mains subject to regulation for the protection of society. * * * "

Cantwell v. Connecticut, 310 U.S. 296, 303–304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). (Footnote omitted.) Thus the prohibition of plural marriage has been upheld, even though the practice is a religious duty to some.[29] Similarly, parading without a license [30] and the sale by children of religious literature [31] have been prohibited, even though practiced as tenets of religious faith.

■■ On the other hand, legal restrictions cannot be applied to religious practices, as they can in much of the secular realm, merely on a showing of a rational relationship between the regulation imposed and the legitimate end sought. In Cantwell, supra, 310 U.S. at 304, 60 S.Ct. at 903, the Court stated that "the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." (Emphasis added.) And in West Virginia State Board of Education v. Barnette, 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943), the Court spoke more elaborately and more forcefully to the same issue:

" * * * The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect. * * "

Similarly in Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963), the Court held that " '[o]nly the gravest abuses, endanger-ing paramount interests, give occasion for permissible limitation' " of religious practices. In that case, the Court held that denial of unemployment benefits to those who would not work on Saturday, though permissible as a general rule, could not be applied to one whose refusal to work was based on religious objections.

The principles enunciated in Cantwell, Barnette and Sherbert at least raise a constitutional doubt concerning the condemnation of instruments and literature apparently central to the practice of religion. That doubt becomes more serious when we turn to the decision of the Supreme Court in United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944).

Ballard involved an eccentric religion known as the "I Am" movement. The promoters of this religion, members of the Ballard family, claimed to have been appointed by one "Saint Germain" as "divine messengers," and to have been given the power to cure all diseases. By virtue of these claims, they obtained money from members of the public. They were tried for mail fraud. The trial judge excluded from consideration by the jury the issue of the truth or falsity of their claims to divine designation and miraculous powers, and the case was submitted on the sole issue of whether they made those claims in good faith. They were convicted, and on review the Court of Appeals ruled that exclusion of the issue of truth or falsity was improper. Ballard v. United States, 9 Cir., 138 F.2d 540 (1943).

The Supreme Court reversed the Court of Appeals, holding that the First Amendment prohibited trial of the truth or falsity of religious beliefs:

" * * * Freedom of thought, which includes freedom of religious be-

---

29. Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890); Reynolds v. United States, 98 U.S. (8 Otto) 145, 25 L.Ed. 244 (1878).

30. Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

31. Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L. Ed. 645 (1944).

lief, is basic in a society of free men. * * * It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths. Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. * * * Many take their gospel from the New Testament. But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representations. * * * The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain. * * * "

322 U.S. at 86–87, 64 S.Ct. at 886.

32. We do not perceive any meaningful distinction in the fact that this is a civil *in rem* action whereas *Ballard* was a criminal prosecution. In the first place the Supreme Court has long recognized that *in rem* forfeiture actions are penal in nature and subject to many of the same restrictions placed upon prosecutions. One 1958 Plymouth Sedan v. Pennsylvania, *supra* Note 7; Boyd v. United States, *supra* Note 7. The action taken against appellants here is more than merely remedial; it is punitive. The devices condemned here cannot properly be considered contraband *per se. See One 1958 Plymouth Sedan, supra,* 380 U.S. at 699, 85 S.Ct. 1246, 14 L.Ed.2d 170. They are not in themselves harmful, as are adulterated foods and drugs or miswired electrical devices. Their only alleged illegal attribute is the supposedly false claims made concerning their powers.

Second, we do not perceive the constitutional defect found in *Ballard* to have been the prosecution of individuals for promulgating false religion. That defect was rather the *litigation* of the truth or falsity of religious doctrines. *See* 322 U.S. at 87, 64 S.Ct. at 887:

The *Ballard* case does not hold merely that religious belief is protected. The Ballards engaged in action; they solicited money from their faithful. Rather the holding of the case seems to be that regulation of religious action which involves testing in court the truth or falsity of religious belief is barred by the First Amendment.

The relevance of *Ballard* to the case before us is obvious.[32] Here the E-meter has been condemned, not because it is itself harmful, but because the representations made concerning it are "false or misleading." And the largest part of those representations is contained in the literature of Scientology describing the process of auditing which appellants have claimed, without contest from the Government, is part of the doctrine of their religion and central to its exercise. Thus if their claims to religious status are accepted, a finding that the seized literature misrepresents the benefits from auditing is a finding that their religious doctrines are false. To construe the Food, Drug and Cosmetic Act to permit

" * * * But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. *When the triers of fact undertake that task, they enter a forbidden domain.* * * * " (Emphasis added.)

Thus under *Ballard* it seems unlikely that a disgruntled former adherent could sue a church for fraud and deceit because it had collected money from him on the basis of allegedly "false" doctrines concerning salvation, heaven and hell— or for that matter on the basis of doctrines, such as those of the Christian Scientists, concerning the cause and cure of disease.

Indeed, the Supreme Court has recently unanimously held that courts cannot settle a civil property dispute between church bodies where the dispute turns on the orthodoxy of the religious doctrines espoused by the parties. Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969).

such a finding would, in the light of *Ballard*, present the gravest constitutional difficulties.

D. It is with these constitutional considerations in mind that we turn to our examination of the application of the statute to the facts of this case. Appellants have argued that much of the Scientology literature from which claims concerning the curative powers of auditing was culled by a Government witness is not "labeling" of the E-meter within the meaning of the Act, since it is part of the religious doctrine of their church.

For purposes of the Act, "the term 'labeling' means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." [33] Most of the litigation over this definition has turned upon the question of when written matter may be said to "accompany" an article. In this case the Government has contended that Scientology literature on sale in the Distribution Center, which adjoins the Hubbard Guidance Center where E-meters were used in auditing, "accompanied" the E-meters.

The courts have construed the word "accompanying" to give broad remedial effect to the purposes of the Act. In Kordel v. United States, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948), the Supreme Court ruled that, in order to be considered "labeling" of a drug, promotional pamphlets need not be shipped together with the drug. It held that:

"One article or thing is accompanied by another when it supplements or explains it, in the manner that a committee report of the Congress accompanies a bill. No physical attachment one to the other is necessary. * * *

"The false and misleading literature in the present case was designed for use in the distribution and sale of the drug, and it was so used. * * * "

335 U.S. at 350, 69 S.Ct. at 109. Nor did the fact that the pamphlets were sold save them from being "labeling" in the context of that case:

" * * * [T]he booklets and drugs were nonetheless interdependent; they were parts of an integrated distribution program. The Act cannot be circumvented by the easy device of a 'sale' of the advertising matter where the advertising performs the function of labeling."

*Ibid.*

■ *Kordel* thus laid down the broad lines for determining whether literature "accompanies" a drug or device; to do so it need not be shipped together with the device, but it must be "designed for use in the distribution and sale of" the device, and the two must be "parts of an integrated distribution program."

Subsequent cases in the lower courts have helped sketch in the rough outlines drawn by *Kordel*. In the *Molasses* [34] case, a best-selling book extolling the curative powers of blackstrap molasses, though mentioning no brand names, was used by health food retailers in a promotional scheme. A copy of the book was placed in the window of the store next to a display of their brand of molasses. Prospective purchasers of molasses inside the store were handed copies of the book and referred to passages in it which made the misleading claims about the product. The particular copies of the book used in this scheme were found by the District Court to "accompany" the molasses. [35]

On the other hand, in the *Balanced Foods* [36] case, general literature which falsely claimed healthful properties for a food was found by the Second Circuit not

33. 21 U.S.C. § 321(m).

34. United States v. 8 Cartons, etc., Molasses, W.D.N.Y., 103 F.Supp. 626 (1951).

35. For a similar case, involving the book ABOUT HONEY, *see* United States v. 250 Jars, etc., of U. S. Fancy Pure Honey, E.D.Mich., 218 F.Supp. 208 (1963), *affirmed*, 6 Cir., 344 F.2d 288 (1965).

36. United States v. 24 Bottles "Sterling Vinegar & Honey, etc.", 2 Cir., 338 F.2d 157 (1964).

to "accompany" it. The facts of that case are interesting. The best-sellers FOLK MEDICINE and ARTHRITIS AND FOLK MEDICINE prescribed a mixture of vinegar and honey for a wide variety of maladies. After FOLK MEDICINE achieved success, a health food manufacturer bottled a preparation of this mixture for sale. The manufacturer also purchased copies of the book and distributed them after special promotional efforts to the same health food outlets which sold the mixture. There was evidence that the retail stores displayed the mixture and copies of the book a few feet apart. On these facts, the court reversed a judgment that the book constituted "false labeling" of the food. The court distinguished *Kordel* on the ground that the drug and pamphlet in that case had been mailed in "integrated transactions," and that the vendors had given away copies of the pamphlets with sales of the drugs in some instances.[37]

█ The facts of the case before us differ materially from those in the cases just reviewed. The alleged "labeling" here is not a single readily digestible book, or a collection of pamphlets obviously promotional in nature, but rather a vast array of the often obscure literature of Scientology. This literature was, according to the evidence at trial, all offered for sale at the Distribution Center, Inc., a corporation affiliated with the Founding Church, which had its book store next to the Guidance Center at which Scientology auditing services were provided.

A small proportion of this literature deals directly with the E-meter itself. Two books, apparently intended for Scientology auditors rather than the general public, describe the nature and workings of the E-meter, and at the same time give some guidance as to its use in the auditing process.[38] Within these books can be found statements to the effect that the E-meter is an essential aid to proper auditing. However, these works contain very little of what the Government contends is false and misleading in the labeling of the E-meter. Though there are claims concerning the scientific properties of the E-meter which are open to question,[39] the Government placed little reliance upon these in presenting its case to the jury.

Among the literature of Scientology before the court there are found a few advertisements, apparently directed at the general public, which make direct appeals for customers (or converts, if the appellants' version is to be accepted). These advertisements are found in copies of the monthly Scientology magazine ABILITY. Their representations concerning the auditing process appear to be general come-ons, designed to bring in the curious or the gullible.[40]

By far the greatest bulk of the material alleged to be "false labeling" of the E-meter consists of the general literature of Scientology, which presents in an inte-

37. In another case the Second Circuit has found general literature (in this case articles in medical journals) to be "labeling" because it was used in a promotional scheme with a device. United States v. Diapulse Manufacturing Corp. of America, 2 Cir., 389 F.2d 612, *cert. denied*, 392 U.S. 907, 88 S.Ct. 2059, 20 L.Ed.2d 1365 (1968).

38. J. SANBORN, THE HUBBARD ELECTROMETER (1959); L. R. HUBBARD, E METER ESSENTIALS 1961.

39. For instance, in E METER ESSENTIALS 1961, *supra* Note 38, at 18, Hubbard claims that "[t]he meter will also read Basal Metabolism." The Government included this claim among its allegations

of false labeling in the libel. However, the great bulk of the allegations charges that false or misleading statements were made, not about the E-meter itself, but about the process of auditing in which it is used.

40. *See, e.g.*, ABILITY, No. 58, at 5:
"Plagued by illness? We'll make you able to have good health. Get processed by the finest capable auditors in the world today. Every auditor a D.D. One-week intensive. Three-week intensive. Weekend group intensives. Personally coached and monitored by L. Ron Hubbard, Founder. Come to Registrar, 1812–19th Street, N. W., Washington 9, D. C."

grated manner the theory sketched earlier concerning the human mind, the sources of various sorts of unhappiness, personality disorder and psychosomatic complaints, and the way in which the process of auditing can alleviate these ills. Within this literature is to be found only the most occasional passing reference to the E-meter; more often than not, the meter is not even mentioned in these general works. Among these are the introductory works describing Scientology, and it is presumably these works, if any, which are pressed upon curious members of the public in any effort which might be made to promote the sale of Scientology services.

It is within this general literature that the Government has found the passages which, in isolation, stand out most dramatically as fraudulent healing claims. For instance, in perhaps the most obscure and impenetrable of the books, Hubbard's SCIENTOLOGY: A HISTORY OF MAN (4th ed. 1961), occurs the damaging sentence: "Cancer has been eradicated by auditing out conception and mitosis." [41] In short, it is upon this mass of literature that the Government largely depended in showing, to the satisfaction of the jury, that the Scientology movement had made false claims concerning the curative powers of its auditing techniques.

These, however, are the books which set forth the doctrines of Scientology. If that movement is a religion, as appellants here have claimed, and as the Government has not denied, these books are its scriptures. The statements concerning the powers of auditing over the ills of mind and body are not readily separable from general statements of Scientological doctrines concerning the nature of man and the relationship of his mind to his body. Many will find these doctrines, those which relate to health as well as those which do not, absurd or incoherent. But the *Ballard* case makes suspect the legal inquisition of such doctrines where they are held as religious tenets.

Were the literature here introduced clearly secular, we might well conclude that under existing law it constituted "labeling" for purposes of the Act. Such a conclusion might be justified by a broad reading of the statute, consistent with its high purpose of protecting the public health and pocketbook against health frauds. However, such broad readings are not favored when they impinge upon constitutionally sensitive areas, especially in the absence of a showing of legislative intent to regulate these areas. Nothing in the history or interpretation of the Act indicates that it was meant to deal with the special problem of religious healing, a problem often given legislative treatment separate from that imposed upon the general area of public health and medical practice.[42] In light of these considerations, highlighted by the explicit holding of *Ballard*,[43] we

---

41. At page 21.

42. 2 D.C.CODE § 134(d) (1967) exempts from the operation of the medical licensing laws "persons treating human ailments by prayer or spiritual means, as an exercise or enjoyment of religious freedom * * *." According to Cawley, *Criminal Liability in Faith Healing*, 39 MINN.L.REV. 48, 64 (1954), "[M]ost, if not all, * * * states * * * except from the licensing requirements those persons who endeavor to treat human ailments by prayer or spiritual means exclusively." It has been argued that the Constitution requires such exceptions to medical licensing laws. People v. Cole, 219 N.Y. 98, 111, 113 N.E. 790, 795, L.R.A.1917C, 816 (1916) (concurring opinion of Chief Judge Bartlett). Official and unofficial exemptions from various health regulations have protected Christian Scientists in the exercise of their religion. *See* Schneider, *Christian Science and the Law: Room for Compromise?*, 1 COLUM.J.LAW & SOC. PROB. 81 (1965).

43. The Ballards made claims to miraculous healing powers and collected money on the basis of these claims. The truth or falsity of their claims was held not subject to evaluation in a prosecution for mail fraud. They marketed no "device" in connection with their claims, but it is difficult confidently to conclude that had they, and had their practices been attacked under food and drug laws

interpret the Act as not including within its concept of "labeling" the literature developing the doctrines of a religion.

▇▇ E. Finally, we come to the vexing question: is Scientology a religion? On the record as a whole, we find that appellants have made out a *prima facie* case that the Founding Church of Scientology is a religion. It is incorporated as such in the District of Columbia. It has ministers, who are licensed as such, with legal authority to marry and to bury. Its fundamental writings contain a general account of man and his nature comparable in scope, if not in content, to those of some recognized religions.[44] The fact that it postulates no deity in the conventional sense does not preclude its status as a religion.[45].

The Government might have chosen to contest the claim that the Founding Church was in fact a religion. Not every enterprise cloaking itself in the name of religion can claim the constitutional protection conferred by that status. It might be possible to show that a self-proclaimed religion was merely a commercial enterprise, without the underlying theories of man's nature or his place in the Universe which characterize recognized religions. Though litigation of the question whether a given group or set of beliefs is or is not religious is a delicate business,[46] our legal system sometimes requires it so that secular enterprises may not unjustly enjoy the immunities granted to the sacred. When tax exemptions are granted to churches, litigation concerning what is or is not a church will follow.[47] When exemption from military service is granted to those who object on religious grounds, there is similar litigation.[48] When otherwise proscribed substances are permitted to be used for purposes of worship, worship must be defined.[49] The law has provided doctrines and definitions, unsatisfactory as they may be, to deal with such disputes.[50] Since the Government chose not to contest appellants' claim to religious status, and since in our view appellants have made a *prima facie* case for such status, we conclude that for purposes of review of the judgment before us they are entitled to the protection of the free exercise clause.[51]

rather than the mail fraud statute, the truth of their claims would have been any more a fit subject for litigation.

44. *See* text accompanying Notes 21–26, *supra.*

45. *See* United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); Washington Ethical Society v. District of Columbia, 101 U.S.App.D.C. 371, 249 F.2d 127 (1957).

46. *Cf.* United States v. Ballard, 322 U.S. 78, 92, 64 S.Ct. 882, 88 L.Ed. 1148 (1944) (dissenting opinion of Mr. Justice Jackson).

47. Washington Ethical Society v. District of Columbia, *supra* Note 45; *and see particularly,* for perhaps the fullest discussion of the meaning of religion for tax exemption purposes, Fellowship of Humanity v. County of Alameda, 153 Cal.App.2d 673, 315 P.2d 394 (1957).

48. United States v. Seeger, *supra* Note 45; United States v. Kauten, 2 Cir., 133 F.2d 703 (1943).

49. People v. Woody, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964); In re Grady, 61 Cal.2d 887, 39 Cal.Rptr. 912, 394 P.2d 728 (1964).

50. For thoughtful efforts at "defining" religion in the context of litigation, *see* United States v. Seeger, *supra* Note 45 (with concurring opinion of Mr. Justice Douglas, 380 U.S. at 188, 85 S.Ct. 850), and Fellowship of Humanity v. County of Alameda, *supra* Note 47. Further on the question *see* Comment, *Defining Religion: Of God, the Constitution and the D.A.R.,* 32 U.CHI.L.REV. 533 (1965); Boyan, *Defining Religion in Operational and Institutional Terms,* 116 U.PA.L.REV. 479 (1968). For recognition that the *bona fides* of religious professions may properly be litigated, *see* United States v. Seeger, *supra* Note 45, 380 U.S. at 185, 85 S.Ct. 850; In re Grady, *supra* Note 49; People v. Cole, *supra* Note 42, 113 N.E. at 794.

51. The Founding Church of Scientology has sued the United States in the Court of Claims for recovery of income taxes paid upon denial of an exemption to the Church under 26 U.S.C. § 501(c), In-

Appellants have contended that their theories concerning auditing are part of their religious doctrine. We have delineated in detail the evidence on which this claim is based. Again the Government has not contested this claim; it has not tried to argue or prove, for instance, that even if Scientology as practiced here is a religion, auditing services have been peddled to the general public on the basis of wholly non-religious pseudo-scientific representations.[52] We cannot assume as a matter of law that all theories describing curative techniques or powers are medical and therefore not religious. Established religions claim for their practices the power to treat or prevent disease, or include within their hagiologies accounts of miraculous cures.[53] In the circumstances of this case we must conclude that the literature setting forth the theory of auditing, including the claims for curative efficacy contained therein, is religious doctrine of Scientology and hence as a matter of law is not "labeling" for the purposes of the Act.

This case was tried before a jury on two charges: that the E-meter was misbranded in that its "labeling" made false or misleading claims concerning the process of auditing in which it was used, and that the E-meter was not accompanied by adequate instructions for its use. The jury returned a general verdict for the Government. During the course of the trial, in an effort to prove the first of these two charges, the Government put into evidence some thousands of pages of Scientology literature, all of which the jury was invited to consider on the issue of misbranding. Through a Government witness, the jury's attention was directed to passages in this literature describing the theories of Scientology as they relate to auditing and claiming curative powers for that process. We have found that, under *Ballard,* these theories are not properly subject to courtroom evaluation as to truth or falsity. Since the jury's general verdict may have rested in whole or in part on a finding that this literature was false

ternal Revenue Code of 1954, which exempts a corporation "organized and operated exclusively for religious * * * or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual * * *." A Commissioner of the Court of Claims has filed an opinion, including findings of fact and recommended conclusion of law, recommending that the court uphold the denial of the exemption (No. 226–61, filed August 7, 1968). The Commissioner found that a large part of the activities of the Founding Church was profit making in nature, and that some of its net earnings inured to the benefit of L. Ron Hubbard.

52. As one thoughtful commentator has noted: "[W]e can only know that a claim is based on religion when we are told that it is. The legal basis for stating that a claim is in the religious domain can be that it is held out as being religious in nature."

And further:

"* * * If a man simply sells bad drugs and defends on religious grounds, we can find his defense insufficient. For we say: first, you failed to define your claims as religious and they were claims of a nature that would not ordinarily be understood as religious; second, holding yourself out as a drug salesman implied that you spoke with medical authority. * * *"

Weiss, *Privilege, Posture and Protection: "Religion" in the Law,* 73 YALE L.J. 593, 604, 605 (1964).

The distinction between a healer who represents his cure from the first as religious, and one who represents it as medical or scientific but then defends on the basis of religion, is well marked by two New York cases, People v. Cole, *supra* Note 42 (Christian Science practitioner who cured only by prayer exempt from medical licensing statute), and People v. Vogelgesang, 221 N.Y. 290, 116 N.E. 977 (1917) (Cardozo, J.) ("faith healer" who advertised self as "specialist in all forms of chronic diseases" and who prescribed drugs not exempt).

In this opinion, of course, we imply no view as to whether the District of Columbia medical licensing statute, 2 D.C.CODE §§ 120, 134 (1967), is applicable to appellants' activities.

53. *See, e. g.,* Schneider, *op. cit. supra* Note 42.

or misleading labeling of the E-meter, that verdict must be set aside.

### III

Since our road to this conclusion has been long and complex, we think it appropriate to summarize what we have and what we have not held. We have held the following:

(1) On the basis of the record before us, the Founding Church of Scientology has made out a *prima facie* case that it is a *bona fide* religion and, since no rebuttal has been offered, it must be regarded as a religion for purposes of this case.

(2) On the record before us, a *prima facie* case exists that auditing is a practice of Scientology, and that accounts of auditing integrated into the general theory of Scientology are religious doctrines. Since no rebuttal has been offered, we must take the point as proven.

(3) In view of the constitutional doctrine of United States v. Ballard, *supra,* literature setting forth religious doctrines, and related to an instrument in the manner in which the "auditing" literature here is related to the E-meter, cannot be subjected to courtroom evaluation and therefore cannot be considered "labeling" of such an instrument for purposes of the "false or misleading labeling" provisions of the Act.

On the other hand, the following should be noted:

(1) We do not hold that the Founding Church is for all legal purposes a religion. Any *prima facie* case made out for religious status is subject to contradiction by a showing that the beliefs asserted to be religious are not held in good faith by those asserting them, and that forms of religious organization were erected for the sole purpose of cloaking a secular enterprise with the legal protections of religion.

(2) We do not hold that, even if Scientology is a religion, all literature published by it is religious doctrine immune from the Act.

(3) We do not hold that public health laws in general, or the Food, Drug and Cosmetic Act in particular, have no application to the activities of religion. For instance, it may well be that adulterated foods, drugs or devices used in religious practices can be condemned under the Act.[54] It may be that a drug or device used in religion is subject to condemnation as "misbranded" if its labeling is found to lack, for instance, adequate directions for use, as was charged in this case.[55] Our holding prevents only a finding of false labeling on the basis of doctrinal religious literature.

(4) Finally, we make no holding concerning the power of Congress to deal generally with the making of false claims by religions deemed injurious to the public health or welfare. The *Ballard* case of course casts doubt on some aspects of such a power; but this opinion makes only a narrowing construction, in a constitutionally sensitive area, of a statute which has otherwise quite properly been construed broadly by the courts.

Reversed.

McGOWAN, Circuit Judge (dissenting):

At the trial in the District Court, the Government put in evidence from which, in my view, a jury would be warranted in finding that (1) the practice of the asserted religion of Scientology involved the use of a mechanical device in association with certain publications which represented the device to have utility in the prevention, relief, or cure of physical illnesses such as cancer, and (2) the device in fact had no such capacity. The majority, as I understand it, holds that, because the Government did not go further and prove that Scientology was not a bona fide religion, the First Amendments, as interpreted in United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), bars any judicial inquiry whatsoever into whether the device had the healing powers claimed for it. Absent such a determination, the

---

54. *See* 21 U.S.C. §§ 331(a), 334(a), 341, 351.

55. *See* 21 U.S.C. § 352(f) (1).

majority logically concludes that a judgment that the device is misbranded can not be upheld.

This proceeding did not involve an inquisition into the validity of any personal religious beliefs, or the infliction of a punishment upon any person for holding or disseminating such beliefs. It was a proceeding against property under a Congressional statute aimed at protecting the unsophisticated against not only wasting their money but, more importantly, endangering their lives by relying upon misbranded machines. There is, as the majority points out, a well-recognized distinction between the good faith holding of a religious belief, however bizarre, and unlimited freedom to implement that belief by conduct. I do not believe that the Government was required, at least in a statutory *in rem* proceeding of the kind here involved, to show that, over and above the misbranding of the device, the religious pretensions of its sponsors were fraudulent.

I respect the difficulties my colleagues have with the *Ballard* case, but I do not think it compels the result they reach. That was a criminal prosecution for mail fraud of an individual who proclaimed as a religion the fact that he was a "divine messenger" endowed by the appointment of "St. Germain" with the power to cure all diseases. The case, at least in its then posture, did not involve a practice of giving healing treatments for hire, much less the sale and use of devices like the meters with which we are concerned here. To the extent that there are expressions in *Ballard* that may conceivably point in the direction the majority goes, I would limit them to the peculiar facts of that case, which, to repeat, did not involve the use of misbranded devices and did result in criminal proceedings against the persons there involved.

I am not, however, satisfied that the Government officials did not sweep too broadly in this seizure. The meters are vulnerable to seizure only if they are misbranded, and the misbranding here must be found in separate, but associated, pieces of literature. The record before us is such as to support a finding that certain items of the Scientology literature did contain healing claims (i. e, "Cancer has been eradicated by auditing out conception and mitosis"); and that the association of these claims with the meter is sufficiently close as to justify the latter's seizure. But this relationship in the case of one or more books or pamphlets would not necessarily mean that all the Scientology literature is subject to confiscation. Every aspect of the practice or preaching of a religion cannot be interfered with simply because one phase of it is exposed to legal action.

The District Court was at some pains to identify those items of literature which effected misbranding of the meters, and those which did not. It is not clear to me that this separation was uniformly successful in differentiating affirmations of faith, on the one hand, from representations as to the curative capacities of the meters, on the other. Indeed, it may be that, absent a special showing of need beyond that for evidentiary use, the Congressional purposes are exhausted by a seizure and permanent retention of the devices alone. Certainly, as a practical matter, the objectives of the statute would normally be realized thereby, and difficult problems of religion and speech, inherent in the wholesale seizure of printed matter, avoided.

On Appellee's Petition for Rehearing

PER CURIAM:

From the Government's petition for rehearing in this case, it appears that the following clarifying observations are in order.

I

 The Government has correctly inferred from our opinion that a showing that "auditing services have been peddled to the general public on the basis of wholly non-religious pseudoscientific representations" would support a verdict of false labeling. 133 U.S.App. D.C. at ——, 409 F.2d at 1161. We gave as further explication of this view a

passage from Weiss, *Privilege, Posture and Protection: "Religion" in the Law*, 73 YALE L.J. 593, 604, 605 (1964), and citations to two instructive New York cases, People v. Cole, 219 N.Y. 98, 113 N.E. 790, L.R.A.1917C, 816 (1916), and People v. Vogelgesang, 221 N.Y. 290, 116 N.E. 977 (1917). Our basic point is that, in order to raise a religious defense to a charge of false statement (here misbranding), the person charged with the alleged misrepresentation must have explicitly held himself out as making religious, as opposed to medical, scientific or otherwise secular, claims.

The Government now argues that there was sufficient evidence in the record to permit the jury to find false labeling on the basis of "wholly non-religious pseudo-scientific representations." In the thousands of pages of Scientology literature introduced at trial, it finds passages which appear to be based on secular rather than religious claims, such as the claim that Scientology is "a precise and exact science, designed for an age of exact sciences," and that "[n]o other subject on earth except physics and chemistry has had such grueling testing (proofs, exact findings)." [1]

This argument misconceives the ground upon which we reversed. We did not find insufficient competent evidence to support a verdict, nor did we find that all literature submitted to the jury as "false labeling" was religious doctrine. Rather we found that *some* of that literature was at least *prima facie* religious doctrine, and that the jury, as it was instructed, [2] could have found against the E-meter by finding false statements in "labeling" which was at the same time religious doctrine. *See* main opinion, 133 U.S.App.D.C. at ——, 409 F.2d at 1161. And, of course, where a jury's general verdict *may* have rested upon grounds improper for First Amendment reasons, a reviewing court will not pause to speculate whether the jury's verdict was actually reached on other, and permissible, grounds. Stromberg v. California, 283 U.S. 359, 367–368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969).

## II

In its petition, the Government finds unclarity in our failure to state whether or not a second trial may follow in this case. Of course, it is not within our power authoritatively to declare the *res judicata* effect of our own decision. However, since the basis of our reversal was that the case was improperly framed, rather than that the Scientologists' devices and literature were absolutely pro-

---

1. In our main opinion, we have already noted that some claims made on behalf of the E-meter and the auditing process, and introduced into evidence at trial, had no discernible relation to whatever religious content Scientology might have. *See* 133 U.S.App.D.C. at ——, 409 F.2d at 1158, n. 39 and n. 40.

2. A tremendous volume of Scientology literature was submitted to the jury, and the jury was charged that if the literature "accompanied" the E-meter in the sense described in the main opinion, 133 U.S. App.D.C. at ——, 409 F.2d at 1157 it was labeling. Thus there was neither a winnowing out by the judge of the religious material, nor an instruction to the jury that it could not find such material to be false labeling.

It is true that no such sifting process and no such instruction was requested

by appellants. Appellants framed their First Amendment point in more broadside fashion as described in the main opinion, 133 U.S.App.D.C. at ——, 409 F.2d at 1154. However, even though the narrower *Ballard* point was never raised in the form of objections to evidence or suggested jury instructions, we regard it as subsumed in the broader free exercise objections actually made. In any case, a denial of First Amendment rights is one of those exceptional instances where an appellate court will notice error in the charge even where no objection is made at trial. 5 J. MOORE, FEDERAL PRACTICE ¶ 51.04 (2d ed. 1968); Shokuwan Shimabukuro v. Higeyoshi Nagayama, 78 U.S.App.D.C. 271, 273, 140 F.2d 13, 15, *cert. denied*, 322 U.S. 755, 64 S.Ct. 1270, 88 L.Ed. 1584 (1944).

tected, or that the evidence was insufficient, it would appear that a new trial would be in order.

■ If a new trial does follow, a further observation may be helpful. We have held that as a matter of statutory construction compelled by the constitutional doctrine of United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), religious claims cannot be found "false labeling" within the meaning of the Food, Drug and Cosmetic Act. Thus it is incumbent on the trial judge to rule in the first instance whether each item of alleged false labeling makes religious claims and hence cannot be submitted to the jury for the factual determinations of whether it is a label for the device in question and whether it is false.[3] *See* Jacobellis v. Ohio, 378 U.S. 184, 187–188, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964).

■ Finally, it should be noted that the Government up to this time, including its motion for rehearing, has not challenged the *bona fides* of appellants' claim of religion. In the event of any new trial, as indicated in the panel opinion, it would be open to the Government to make this challenge. If the challenge is made successfully, the First Amendment question would, of course, disappear from this case. *See* United States v. Kuch, D. D.C., 288 F.Supp. 439 (1968).

Circuit Judge McGOWAN does not join in this clarification of the majority opinion, and continues to adhere to his dissenting opinion.

3. With respect to this item-by-item determination, the inquiry should be whether that item puts forward its allegedly false claims respecting the E-meter or auditing on a "wholly non-religious" basis. Of course, this does not preclude a finding that an item (book, pamphlet, advertising flier) makes out a self-sufficient non-religious claim for Scientology services, to which a religious appeal has been merely tacked on.